STILLMAKER ET AL., D. B. A. STILLMAKER DISTRIBUTION CO., APPELLEES, *v.* DEPT. OF LIQUOR CONTROL ET AL., APPELLANTS.

(No. 68-283—Decided June 18, 1969.)

*Messrs. Topper & Alloway, Mr. James F. DeLeone, Messrs. Lindhorst & Dreidame, Messrs. Tyler, Kane & Rubin* and *Mr. Paul L. Watson,* for appellees.

*Mr. Paul W. Brown,* attorney general, and *Mr. James E. Rattan,* for appellants.

MATTHIAS, J.  The question before this court is whether the machines involved in the instant case are gambling devices *per se.*

The machines are of the pinball variety, and were put into evidence and actually operated for the Court of Common Pleas. Their operation is well described in appellants' brief as follows:

" * * * In many respects their operation is no differ-

ent than that of the usual 'pinball' machine. The insertion of a coin, a dime in this instance, activates the machine and provides the player with five metal balls which, by the use of a spring-loaded plunger, may be propelled with varying degrees of force out onto the slightly inclined playing surface of the machine. This playing surface has obstructions which the balls may strike and, on these particular types of machines, numbered receptacles in which the balls may become lodged as they proceed down it.

"Scoring on the machines is somewhat similar to that in the commonly known game of 'Bingo.' The upright face, or scoreboard, has represented on it six cards, similar to 'Bingo' cards, each divided into 25 squares with each square in random arrangement containing a number corresponding to that of a receptacle on the playing surface of the machine. In play of the game, when one of the balls becomes lodged in a receptacle on the playing surface, the number corresponding to that receptacle becomes lighted wherever it appears on any of the 'Bingo' cards on the scoreboard which have been lighted and made available for scoring in that particular game.

"With insertion of the initial dime (in addition to activating of the machine and making the five metal balls available for play) there is lighted and made available for scoring *one* of the six 'Bingo' cards on the machine's scoreboard. If, like the player of the game 'Bingo,' the operator of the machine desires to play on more than one card at a time, however, he may make additional cards available for scoring by inserting additional dimes into the machine, one for each addtional card desired up to the limit of five more cards represented on the machine's scoreboard. In other words, an initial game consisting of the play of the five balls may, at the player's option, be conducted in six different ways, at six different prices:

"1. Five balls and 1 card to score on—10c
"2. Five balls and 2 cards to score on—20c
"3. Five balls and 3 cards to score on—30c
"4. Five balls and 4 cards to score on—40c
"5. Five balls and 5 cards to score on—50c
"6. Five balls and 6 cards to score on—60c

"""**

"As outlined above, initial scoring on these machines is by lighting of numbers in the 'Bingo' cards on the scoreboard which have been made available for play of the particular game. Final scoring, however, is based, again much as in the game of Bingo, on whether play results in lighting of three or more numbers in a line on any of the cards available for play in that particular game. Achievement of three numbers in a line results in a score of 400 points; achievement of four numbers in a line results in a score of 2,400 points; and achievement of five numbers in a line results in a score of 200,000 points * * * .

"What sets these devices apart from the usual 'pinball' machine is the way they operate when the player begins a second game after a score has been achieved in play of the first game. Insertion of a dime is required, as in the first game, to obtain the five metal balls for play and one lighted 'Bingo' card to score on; *but* where a score has been achieved in the previous game, the machines automatically convert such score to additional lighted cards for scoring, at the rate of one card for 100 points of score up to the limit of six cards, with any unconverted score remaining registered on the machine.

"In other words, where a player achieves three numbers in a line and the resulting score of 400 points in the first game, when he then deposits another dime for play of a second game, he gets, not five balls and one lighted card (as he did for his dime in the first game) but five balls and *five* lighted cards (one for his dime and one for each 100 of his 400 points of score)—an opportunity for play and, presumably, amusement that would have cost the player 50c when he first began play. If the score is 2,400 points when the second game is begun, then the player gets, for his one dime, five balls and *six* lighted cards to score on (a 60c game), plus a carry-over score of 1,900 points and their potential of several more 60c games at the bargain price of a dime each."

In *Westerhaus Co.* v. *Cincinnati,* 165 Ohio St. 327, this court held that a nickel pinball machine which, upon the attainment of a sufficient score, awards a replay without

additional charge, is a gambling device *per se* where the operation of such machine will not, with certainty, result in attaining such score.

In *Westerhaus,* we decided that the elements of gambling are, in general, the payment of a *price* for a *chance* to gain a *prize.* We find all of those elements present with respect to the machines involved in the instant case.

The player of one of the machines involved in the instant case must pay an initial *price* (from 10c to 60c) in order to have a *chance* to score. There is no guarantee of making any score whatsoever. Should a player obtain a score he then has won the right to have a number of cards (according to the score), with which he may achieve a score, illuminated on the next play without paying an additional 10 cents apiece for them, as he would have had to do initially. The *prize,* then, is added amusement without additional cost. (See *Kraus* v. *Cleveland,* 135 Ohio St. 43, wherein this court stated, at page 47 in the opinion: ''Since amusement has value, and added amusement has additional value, and since it is subject to be procured by chance without the payment of additional consideration therefor, there is involved in the game three elements of gambling, namely, chance, price and a prize.'')

Accordingly, we determine that the machines in the instant case are similar in nature to the machines involved in *Westerhaus Co.* v. *Cincinnati, supra,* and we therefore find them to be gambling devices *per se.*

This, of course, necessitates reversal of the judgment of the Court of Appeals.

*Judgment reversed.*

TAFT, C. J., O'NEILL and TROOP, JJ., concur.*
SCHNEIDER and DUNCAN, JJ., dissent.

TROOP, J., of the Tenth Appellate District, sitting for HERBERT, J.

SCHNEIDER, J., dissenting. The Constitution (Section 6, Article XV) forever prohibits ''lotteries, and the sale

---

*This decision was made after the death of JUSTICE ZIMMERMAN and before the appointment of a successor.

of lottery tickets, for any purpose whatever." In defiance of this unequivocal commandment, the General Assembly has expressly authorized betting on horse races, both saddle and harness, at race tracks throughout the state at which beer and liquor are permitted to be consumed. (Chapter 3769, Revised Code, whereby the pari-mutuel or certificate method of wagering is permitted.)

Compare the express proscriptions by the General Assembly in Section 3763.01, Revised Code, wherein a wager "upon a horse race" is declared to be void, and Chapter 2915, Revised Code, which condemns as criminal every conceivable form of betting, wager or lottery on any event, including a "sports event" (Section 2915.121, Revised Code) or "a trial or contest of skill, speed, or power of endurance of man or beast" (Section 2915.09, Revised Code) except that the promoter of a lottery or scheme of chance which is not "for his own profit" is exempted (Section 2915.12, Revised Code).

Thus, the sovereign state of Ohio is in a posture of pharisaism in its insistence on the right to eradicate, through regulation 53 of its Department of Liquor Control, the devices in question here from premises licensed by the state through that department. I had thought we had moved beyond the anachronism that "the King can do no wrong."

The Court of Appeals (13 Ohio App. 2d 29) correctly concluded that "a carry-over from one game to the next of increased scoring odds" is the only thing of value which may be obtained from the device through chance. But assuming that "increased scoring odds" *is* something of value, it is hardly *valuable* enough to matter.

I dissent, therefore, from the decision of the court, not for the reason that I believe that *Westerhaus* v. *Cincinnati* (1956), 165 Ohio St. 327, 135 N. E. 2d 318, itself imparts truth to error, but for the reason that it does not control this case.