**AMUSEMENT DEVICES ASSOCIATION, Pioneer Services, Inc. and Progress Vending, Inc., Plaintiffs,**

v.

**STATE OF OHIO, William J. Brown, Attorney General, Bennie Espy, Thomas Rooney, Caulfield, Assistant Attorneys General and Robert W. Powell, Clerk Common Pleas Court, Clark County, Ohio, Defendants.**

No. C–2–75–511.

United States District Court, S. D. Ohio, E. D.

July 26, 1977.

Arnold Morelli, James W. Farrell, Jr., Lawrence A. Kane, Jr., Cincinnati, Ohio, James F. DeLeone, Columbus, Ohio, Ambrose H. Lindhorst, Cincinnati, Ohio, for plaintiffs.

Thomas V. Martin, Asst. Atty. Gen., Columbus, Ohio, for defendants.

Before PECK, Circuit Judge, and KINNEARY and DUNCAN, District Judges.

## OPINION

DUNCAN, District Judge.

Since January 1, 1974, "engaging in organized crime" has been a felony offense in the State of Ohio. The organized crime statute appears in Chapter 2923 of the Revised Code, which includes penal provisions concerning conspiracy, attempt, complicity, and certain weapons offenses. The statute is R.C. 2923.04, which provides in its entirety as follows (emphasis supplied):

(A) No person, *with purpose to establish or maintain a criminal syndicate or to facilitate any of its activities,* shall do any of the following:

(1) Organize or participate in organizing a criminal syndicate or any of its activities;

(2) Provide material aid to a criminal syndicate or any of its activities, whether such aid is in the form of money or other property, or credit;

(3) Manage, supervise, or direct any of the activities of a criminal syndicate, at any level of responsibility;

(4) *Furnish legal, accounting, or other managerial services to a criminal syndicate;*

(5) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of a type in which a criminal syndicate engages on a continuing basis;

(6) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of violence;

(7) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of bribery in violation of section 2921.02 of the Revised Code.

(B) *Whoever violates this section is guilty of engaging in organized crime, a felony of the first degree.*

(C) *As used in this section, "criminal syndicate" means five or more persons collaborating to promote or engage in any of the following on a continuing basis:*

(1) Extortion or coercion in violation of section 2905.11 or 2905.12 of the Revised Code;

(2) Compelling or promoting prostitution, or procuring in violation of section 2907.21, 2907.22, or 2907.23 of the Revised Code;

(3) Any theft offense as defined in section 2913.01 of the Revised Code;

(4) Any gambling offense as defined in section 2915.01 of the Revised Code;

(5) Illegal trafficking in drugs of abuse, in intoxicating or spirituous liquor, or in deadly weapons or dangerous ordnance as defined in section 2923.11 of the Revised Code;

(6) Lending at usurious interest, and enforcing repayment by illegal means;

(7) *Any offense, for the purpose of gain.*

(D) *A criminal syndicate retains its character as such even though one or more of its members does not know the identity of one or more other members, and even though its membership changes from time to time.*

At issue in this case is R.C. 2923.04(A)(4), which prohibits any person from furnishing legal services [1] to a criminal syndicate with the purpose of establishing or maintaining a criminal syndicate or facilitating any of its activities.

We hold that subsection (A)(4) of R.C. 2923.04 is unconstitutional on its face. This legislation is an effort to limit in uncertain terms the legal services which are available to persons who engage in certain joint criminal ventures. Defendants assert that "a number of persons have concluded that attorneys are an important and integral part of organized crime." We need not and do not express an opinion concerning such a conclusion. The Constitution establishes a framework within which government must remain in its search for public order; the statute before the Court exceeds the bounds of that framework.

## I

This case was filed before Congress's August 12, 1976, repeal of 28 U.S.C. § 2281; since plaintiffs sought an injunction against the operation of a state statute on federal constitutional grounds, a three-judge court was convened. Because § 7 of the repealing legislation, 90 Stat. 1119, Pub.L. 94–381, provides that the legislation "shall not apply to any action commenced on or before the date of enactment," this case is properly before this three-judge court at this time.

This matter is before the Court upon the stipulations of the parties and upon the evidence adduced at the hearing held concerning plaintiffs' application for preliminary injunctive relief. One of the plaintiffs is Amusement Devices Association, an unincorporated association of distributors of devices such as electronic games. Amusement Devices Association assists its members in understanding and complying with the valid laws and regulations which govern the distribution and operation of amusement devices. The Association provides a variety of legal services for its members, including, but not limited to, retaining attorneys to monitor current legal developments and to represent the interests of the association and its members in litigation. Plaintiffs Pioneer Service, Inc. and Progress Vending, Inc. are members of Amusement Devices Association; each distributes amusement devices for profit in this judicial district. Defendants are the State of Ohio, the Attorney General of Ohio, three Assistant Attorneys General, and the Clerk of the Court of Common Pleas of Clark County, Ohio.

On August 9, 1974, pursuant to an Ohio statute, R.C. 109.82, the Governor directed the Attorney General of Ohio to investigate charges of "organized criminal activity" in Clark County, Ohio. The defendant attorney general accordingly ordered agents of the Bureau of Criminal Investigation and Identification to investigate the allegations. Working primarily in undercover capacity, these agents found evidence of gambling in the Clark County area.

The investigation concerned the use of devices commonly known as "Bally Bingo" pinball machines, which are discussed in the margin.[2] Similar machines have been held

---

**1.** It is not clear exactly what kinds of legal services are addressed by the statute. Defendants argue that the statute prohibits "only those legal services which are specifically intended to promote a criminal syndicate and which can be characterized as managerial in character."

**2.** "Bally Bingo" pinball machines are coin activated, electrically operated machines manufactured by the Bally Manufacturing Corporation of Chicago, Illinois. The machines consist of a vertical section attached to a base section

which has four legs. The base section contains a glass-covered playboard with 25 numbered holes and one ball return hole which is inclined toward the front of the machine. In the base section are five metal balls and a spring-loaded plunger which propels the balls onto the playboard. Attached to the playboard are lighted spring bumpers and stationary bumpers located generally over each hole or near each hole. These bumpers are fixed, with no moving parts. The arrangement of the holes and

by the Supreme Court of Ohio to be illegal gambling devices. *Stillmaker v. Department of Liquor Control*, 18 Ohio St.2d 200, 249 N.E.2d 61 (1969). Similar machines have been held to be "gambling devices" under the Gambling Devices Act, 15 U.S.C. § 1171 *et seq.*, and therefore subject to forfeiture if shipped in interstate commerce. *United States v. Two Coin-Operated Pinball Machines*, 241 F.Supp. 57 (W.D. Ky.1965), *aff'd sub nom. United States v. H. M. Branson Distributing Company*, 398 F.2d 929 (6th Cir. 1968).

On December 30, 1974, 36 search warrants were executed against persons displaying these machines and against two distributors: Hughes Music Company and the Supreme Novelty Company, both of Clark County, Ohio. Evidence seized pursuant to these search warrants revealed that in addition to some 78 seized machines, numerous other machines were on location in Clark and Greene County, Ohio.

A special grand jury was convened on April 15, 1975, at the request of the attorney general. On July 16, 1975, the grand jury returned indictments against Supreme Novelty Company and Hughes Music Company, both of which were members of Amusement Devices Association. On the same day, the grand jury returned indictments against the presidents of these companies. Each of these indictments charged a violation of subsection (A)(4) and four other violations of R.C. 2923.04.

Testimony before the grand jury indicated that a portion of the proceeds from these gambling devices was sent to plaintiff Amusement Devices Association, in Cincinnati, Ohio. On July 22, 1975, six days after returning the indictments mentioned above, the special grand jury issued subpoenas duces tecum upon Elinor C. Batte, a clerk for the Association, and upon Robert J. Bunker, accountant for the Association. As issued, the subpoenas required Batte and Bunker to appear before the grand jury as witnesses on July 29, 1975, and to bring with them various documents of Amusement Devices Association, including "any records, books, documents or communications evidencing the membership of Amusement Devices Association, the schedule of dues and the criterion for membership." Also subpoenaed were business records such as account ledgers and journals, plus all written evidence of communications between the Association and its members.

bumpers substantially impairs player control of the ball after it has been propelled onto the playboard. The vertical section, which houses most of the mechanical and electrical components of the machines, has a decorated front referred to as a back-glass.

On the back-glass are displayed six bingo cards in two lines of three. Each bingo card contains the numbers 1 to 25 randomly placed on the cards. The back-glass additionally contains one of several types of scoring registers which electronically displays the numbers of free games which the player wins. The machines are played by inserting one or more dimes or quarters into a coin slot which lights up a corresponding number of bingo cards on the back-glass and entitles the player to five balls. These balls are ejected one at a time into a chute by depressing a lever on the machines. Each ball is then propelled onto the playboard by means of a spring-loaded plunger. The object is to propel the balls into holes on the playing surface which in turn electronically light up the corresponding number on the bingo card displayed on the back-glass. Successful placement of balls in holes which light three, four or five numbers in a horizontal, vertical or diagonal line on the bingo card entitles the player to a corresponding number of free games. The ball descent on the incline surface is totally dependent upon the law of gravity and chance contact with the bumper posts.

Unlike regular pinball machines, there are no levers for manipulating the balls as they roll on the playing surface. The bingo machines have tilt circuits which are designed to minimize player control as a factor in the placement of balls on the playing surface. Each free game won can be utilized by playing the machine again or by receiving a predetermined amount of money which is termed a "pay-off." In the event a "pay-off" is made, the replay register can be immediately cleared by operation of an on-off switch, commonly referred to as a "knock-off" switch usually located on the bottom of the base section of the machine and sometimes located on the electric cord leading to the wall outlet. On machines not equipped with a "knock-off" switch, the same effect noted above is achieved by removing the electric plug from the wall outlet. Inside the base section is a meter, commonly known as a "knock-off" meter, which records the numbers of free games which are eliminated or paid off.

At the July 30, 1975, hearing held in this case, the defendant Chief of Criminal Activities Section of the Ohio Attorney General's Office testified about the focus of the grand jury investigation and about some of the testimony adduced before the grand jury concerning a Columbus attorney, Charles T. Kaps, who has represented Amusement Devices Association in the past:

Q. And I might ask specifically, Mr. Espy, since we've had testimony from Mr. Kaps, has there been any specific attempt by the grand jury to investigate legal assistance or anything in the way of legal advice by Mr. Kaps or other counsel?

. . . . .

A. There was no attempt on behalf of our office to involve Mr. Kaps in this investigation. The questions he referred to in this morning's testimony were asked in the context that the witnesses themselves mentioned the fact that a certain amount of money from these machines, gambling proceeds, went to an attorney in Columbus, Ohio. They also testified that they had legal protection to have these machines. They mentioned— first of all, Mr. Kaps' name was not solicited by our office. It was in that context that the inquiry was conducted.

Q. In terms of the subpoena for the records and books of Amusement Devices Association, in what context was that subpoena issued?

A. We've had testimony from the grand jury throughout the entire term that $6.00 per machine on location which came out of the gambling proceeds went into an association, the association so-named in Cincinnati, Ohio.

Q. What is the name of that association?

A. The Amusement Devices Association. This was the—the modus operandi of every machine in Springfield, the $6.00 going to the Association, paid to the distributor which went to the Association. The testimony sup-

ported that the money went for legal protection. It went for helping them stay out of trouble, and words to that effect.

Q. And as a result of that testimony, did you cause any initial investigation to be made of an office in Cincinnati where Amusement Devices Association is located?

A. Yes. We had testimony from the employees of Supreme Novelty that the money was sent to Amusement Devices Association at 401 Tri-State Building, Cincinnati, Ohio.

. . . . .

Q. Did you at any time make any threats or indicate that in any way you were attempting to interfere with the right of Amusement Devices Association to be represented by counsel?

A. No, we did not. First of all, we don't even know what the Association does or who's involved as counsel. We did not make any threats that the counsel themselves were under investigation. We only wanted to find out or trace the flow of the gambling proceeds from Clark County from the machines to an association and how it was disbursed.

. . . . .

Q. Well, now, let's you and I try to understand each other. You mean the only reason that you asked those witnesses who they were represented by was so that you could know who to contact, what attorney to contact for that witness?

A. The majority of the cases, that's true.

. . . . .

Q. You did ask questions about, "How did you pay the attorney," and, "Did you pay him," and the likes; isn't that true?

A. That's correct. In trying to explain the context, I asked that question.

Q. Well, why do you have to find that out in order to determine who to contact?

A. That question was asked in a context that there were certain persons appearing before the grand jury who paid their $6.00 per week per machine which they believed went for legal protection, which subsequently was cited by the Liquor Control for gambling and retained an attorney by the name of Mr. Kaps, and they did not pay that attorney. It was paid to him from that fund. That was their testimony, to the best of their knowledge. It was paid to him from the fund, so again, that was lawful inquiry.

Q. What was wrong with that?

A. What was wrong with that?

Q. Group legal services?

A. When that question was asked, there was no such theory as group legal services in Cincinnati.

This action was brought on July 25, 1975, and by orders dated July 28, July 30, and August 1, 1975, a single judge of this Court found that plaintiffs were likely to succeed on the merits of their claim that R.C. 2923.-04(A)(4) is unconstitutionally overbroad and vague. The same judge enjoined the defendants from enforcing subsection (A)(4) against any of the plaintiffs in this case, any of the employees, members, or employees of members of a named plaintiff, or any counsel of a named plaintiff or of a member of a named plaintiff. The subpoenas duces tecum issued by the special grand jury on July 22, 1975, were quashed. The injunctive relief issued heretofore in this case was entered pending resolution by this three-judge court of the constitutional questions presented.

On December 2, 1975, the special grand jury was discharged. On March 10, 1976, Hughes Music Company and Supreme Novelty Company each pleaded guilty to a charge of organizing a criminal syndicate to engage in gambling on a continuing basis in violation of R.C. 2923.04(A)(1). The president of each company pleaded guilty to gambling in violation of R.C. 2915.02(A)(2). The remaining charges against the companies and their presidents, including the subsection (A)(4) charges, were dismissed.

## II

■ In addition to defending subsection (A)(4) of Ohio's organized crime statute vigorously on the merits, defendants advance a number of legal principles which they contend should operate to prevent a federal court from deciding this case on the merits. "[C]onstitutional rights are personal and may not be asserted vicariously." *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). Because the statute imposes criminal sanctions upon persons who "furnish legal . . . managerial services," and because plaintiffs are not lawyers, defendants argue that plaintiffs do not have the requisite standing to test the statute's constitutionality before an Article III court. Put differently, defendants argue that no case or controversy exists between these litigants, that there is not "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Company v. Pacific Company*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Our examination of the statute and our review of the facts of this case convince us that Amusement Devices Association and its two plaintiff members have standing to put R.C. 2923.04 to a constitutional test. The language of subsection (A)(4) is important in this context for two reasons. First, the language used is undefined and confusing, thereby arguably having application to certain legal services performed or obtained by Amusement Devices Association for its members. We shall discuss hereinbelow the facial ambiguities which subsection (A)(4) harbors. Second, the statutory language is important because legislation which regulates the furnishing of legal services necessarily impacts substantially the *clients* of the lawyers who are regulated. We hold, then, that Amusement Devices Association has standing to challenge subsection (A)(4) as a procurer or provider of legal services for others. We further hold that Amuse-

ment Devices Association, Pioneer Service, Inc. and Progress Vending, Inc. have standing to challenge the statute as persons *receiving* legal services.

■ Defendants accurately observe that none of the plaintiffs has lost counsel, or been unable to obtain counsel, because of subsection (A)(4). This is true, but the standards of justiciability have not, to our knowledge, been applied to bar litigation until a plaintiff has actually sustained a deprivation of a constitutionally-protected right. A plaintiff need not show that he has undergone a constitutional deprivation; rather, a plaintiff must show that a federally-cognizable injury is not "imaginary," or "speculative," or "chimerical." *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

The facts of this case show a sufficiently direct, real and concrete impact upon these plaintiffs to permit them to challenge subsection (A)(4). The special grand jury returned indictments under *this subsection* against two members of Amusement Devices Association and against the presidents of the indicted member companies. The same grand jury then proceeded to subpoena in sweeping fashion virtually all the business records and communications of plaintiff Amusement Devices Association. The Chief of the Criminal Activities Section of the Ohio Attorney General's Office candidly explained why the subpoenas were issued:

[T]he [special grand jury] witnesses themselves mention the fact that a certain amount of money from these machines, gambling proceeds, went to an attorney in Columbus, Ohio. They also testified that they had legal protection to have these machines . . . .

We've had testimony from the grand jury throughout the entire term that $6.00 per machine on location which came out of the gambling proceeds went to an association, the association so-named in Cincinnati, Ohio.

. . . This was the—the modus operandi of every machine in Springfield, the $6.00 going to the Association, paid to the distributor which went to the Association. The testimony supported that the money went for legal protection. It went for helping them stay out of trouble, and words to that effect.

. . . We had testimony from the employees of Supreme Novelty that the money was sent to Amusement Devices Association, at 401 Tri-State Building, Cincinnati, Ohio.

The defendants' brief includes a similar statement:

Testimony before the grand jury showed that a portion of the gambling proceeds from Clark County [was] sent to an organization in Cincinnati, Ohio, the Amusement Devices Association (ADA). The grand jury issued subpoenas for the business records of ADA in an attempt to determine the purpose and the ultimate recipients of these payments.

We think it apparent on this record that the subpoenas served upon a clerk and accountant of Amusement Devices Association were intended to produce information concerning possible violations of subsection (A)(4) by Amusement Devices Association, its counsel, and perhaps its members. The subpoenas were issued because grand jury testimony indicated that money from illegal machines was sent on a regular basis to Amusement Devices Association for "legal protection." The phrase "legal protection" is one used by the Chief of the Criminal Activities Section. He did not indicate that there was grand jury testimony concerning bribery of public officials; rather, the grand jury testimony concerning "legal protection" was that money "went for helping them stay out of trouble, and words to that effect." In sum, it appears that the special grand jury wanted to know if illegal gambling proceeds were regularly paid to Amusement Devices Association by its members and then pooled by the Association and used to fund legal services needed by individual members of the Association. The nature and direction of the inquiry of the grand jury, coupled with the defendant attorney general's stipulation that but for the preliminary injunctive relief earlier is-

sued in this case, he "would enforce the provisions of Section 2923.04(A)(4), Revised Code, as written, by use of all powers of law enforcement at his control," amply demonstrate, in our judgment, plaintiffs' standing to place subsection (A)(4) at issue.

### III

Emphasizing the words "other managerial services," defendants read the statute in the following manner (citations omitted):

> This language would permit, if not require, a construction limiting the legal services to those which are managerial in nature. This means that they must be services which direct, control or supervise the activities of the criminal syndicate. Defendants submit that services such as drafting a lease, or even appearing in litigation, would hardly belong in such a category.
>
> Defendants submit that the only reasonable construction of the statute is one which prohibits only those legal services which are specifically intended to promote a criminal syndicate and which can be characterized as managerial in character.
>
> This would exclude from the statute the services on which plaintiffs are basing their argument. Defendants also submit, however, that if this Court should find the language ambiguous, the likelihood that the Ohio courts would give a limited construction to the statute is strengthened by the requirement that penal statutes be strictly construed against the state and liberally construed in favor of the accused and by the fact that Ohio courts have held that mere approval or acquiescence in the commission of a crime is not sufficient to find a person guilty as a principal.

Defendants define "legal . . . managerial services to a criminal syndicate," then, as legal services "which direct, control or supervise the activities of the criminal syndicate."

Although they point out that neither drafting a lease nor appearing in litigation falls within their construction of the statute, defendants offer no examples of conduct which they believe could be characterized as furnishing legal services which are managerial in nature. Defendants seem to construe subsection (A)(4) as though it read, "No person trained in the law shall direct, control or supervise the activities of the syndicate with purpose to promote or facilitate a criminal syndicate." According to defendants, this Court should abstain from deciding the federal questions raised by plaintiffs, to permit an Ohio court an opportunity to construe the statute in a manner which might avoid the constitutional questions presented here.

■ We hold that abstention under *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) would be inappropriate in this case. Although defendants' construction of subsection (A)(4) would tend to alleviate a number of the constitutional problems which we perceive in this legislation, we have great difficulty believing that an Ohio court would accept defendants' construction. The subsection of the Ohio organized crime statute which immediately precedes subsection (A)(4), R.C. 2923.04(A)(3), provides that no person shall "Manage, supervise, or direct any of the activities of a criminal syndicate, at any level of responsibility." In light of subsection (A)(3), defendants' construction of subsection (A)(4) is a redundant one. Subsection (A)(3) prohibits *anyone,* whether he or she be lawyer or layman, from managing, supervising, or directing *any* of the activities of a criminal syndicate at *any* level of responsibility. Defendants' construction of subsection (A)(4) does not comport with traditional rules of statutory construction, because it renders the subsection superfluous in light of the rest of the statute. We think it likely that an Ohio court would read subsection (A)(4) to mean something more than that subsection (A)(3) applies to lawyers and accountants. Were a state court to reject defendants' reading of (A)(4) and to endeavor to afford the statutory reference to legal services some meaningful effect, we believe the state court would be obliged to indulge in a

sweeping and essentially legislative redrafting of the subsection in order to avoid the constitutional shoals which exist in these waters. "We have frequently emphasized that abstention is not to be ordered unless the state statute is of an uncertain nature, *and is obviously susceptible of a limiting construction." Zwickler v. Koota,* 389 U.S. 241, 251 n.14, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (emphasis supplied).

■ Defendants' construction in effect reads the words "legal services" out of subsection (A)(4). A state court might eviscerate the subsection in this manner because of the constitutional difficulties raised by any more expansive reading of the statute, but the state court would at that point be addressing the same issues which are presented to us. Issue abstention under the *Pullman* doctrine does not equate with exhaustion of remedies in the state courts. "[W]e do not require petitioner first to seek vindication of his federal rights in a state declaratory judgment action . . . ." *Steffel v. Thompson, supra,* 415 U.S. at 475 n.22, 94 S.Ct. at 1224 (1974) (citations omitted). "[A]bstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim," *Zwickler v. Koota, supra,* 389 U.S. at 251, 88 S.Ct. at 397 (1967) (footnote omitted).

Finally, we note that plaintiffs challenge the constitutionality of subsection (A)(4) on its face, not as applied. "Abstention . . . might be more appropriate when a challenge is made to the state statute as applied, rather than upon its face, since the reach of an uncertain state statute might, in that circumstance, be more susceptible of a limiting or clarifying construction that would avoid the federal constitutional question." *Steffel v. Thompson, supra,* 415 U.S. at 474–75 n.21, 94 S.Ct. at 1223 (1974).

## IV

We turn, then, to the merits of plaintiffs' constitutional claims. In § 2923.04, the General Assembly of Ohio has defined an offense which it calls, in subsection (B), "engaging in organized crime, a felony of the first degree." Under R.C. 2929.11(B)(1)

and (C)(1), conviction of a felony of the first degree may result in imprisonment for a period of twenty-five (25) years and a fine of Ten Thousand Dollars ($10,000.00). Under subsection (C)(7) and subsection (A) of the Ohio organized crime statute, any person who "collaborates" on a "continuing basis" with five or more persons with the specific purpose to promote or engage in "any offense, for the purpose of gain," is guilty of engaging in organized crime. Under subsection (D) of the statute, the offender need not know the identity of one or more other members of the "criminal syndicate," and the membership of the "syndicate" may in fact change from time to time.

We note that this statute is not narrowly drawn to proscribe only particular areas of "organized" criminal activity. Rather, the statute operates to transform any criminal offense of an economic nature, no matter how petty, into one of Ohio's most serious classifications of criminal activity, a felony of the first degree, so long as the offense entails a conspiracy of five or more persons on a "continuing basis." For example, "public gaming," which under R.C. 2915.04 includes placing a bet while at any place of public accommodation, is a minor misdemeanor in the absence of any prior gambling offenses. Under R.C. 2929.21(A) and (D), a minor misdemeanor carries a maximum fine of One Hundred Dollars ($100.00) and no possibility of imprisonment. If, however, such an offense is engaged in by a "syndicate" of five or more persons on a "continuing basis," the organized crime statute is triggered and an offender could receive twenty-five (25) years in jail or a Ten Thousand Dollar ($10,000.00) fine, or both.

R.C. 2923.04 is set out in its entirety at the beginning of this opinion. For purposes of this case, the core of the statute is as follows:

No person, with purpose to establish or maintain a criminal syndicate or to facilitate any of its activities, shall . . . furnish legal, accounting, or other managerial services to a criminal syndicate . . . . .

In simple terms, the merits of this lawsuit involve two questions: What conduct is proscribed by subsection (A)(4), and is that conduct constitutionally protected?

What are "legal . . . or other managerial services"? The statute provides no definition. In ordinary parlance, legal services and managerial services are distinctly different. Managerial services involve the control and supervision of an activity, such as primary decision-making concerning the day-to-day operation of a business. Legal services, on the other hand, include legal advice to management personnel which may or may not affect primary decision-making, plus specialized legal decision-making occurring during litigation and at other times.

The phrase "legal . . . managerial services" is susceptible to varying definitions. Such services could be defined as management services performed by anyone with legal training. They might be defined as all management services which can be performed best by someone with legal training. They could be defined as any legal services which will foreseeably have an effect upon primary management decision-making. They could be defined as the services provided by lead counsel when multiple attorneys represent similar legal interests in a lawsuit. There are other possible variations.

Defendants offer the following explanation for subsection (A)(4) (citations omitted):

The technique used by Ohio is the one recommended by persons who are the most familiar with organized crime. The leaders of organized crime are insulated by several layers of underlings from the persons who create the criminal acts. These persons are the brains of the organization and it is the "hands" not the "brains" which commit the overt acts. Low-level employees can be easily replaced. As long as the leaders remain untouched to manage the establishments which have not been closed and, to reopen those which have, the organization can survive and prosper.

The only effective way to deal with these organizations is to isolate acts which are committed by the management level and assigned greater penalties for such acts and to use a conspiracy theory. This eliminates the necessity of establishing that the leader himself committed an act which is itself a crime.

The State of Ohio has determined that [rendering] legal services which are managerial in nature is one of the activities which should be prohibited. Defendants submit that this determination cannot be characterized as unreasonable. A number of persons have concluded that attorneys are an important and integral part of organized crime.

The Constitution of the United States reserves to the respective states broad and substantial police powers which include the power to define criminal activity within their jurisdictions and the power to punish such activity. Our system of federalism in fact encourages state legislatures to experiment with modern, innovative responses to socially harmful activities. Nevertheless, the penal statutes of each state must be drafted in such a manner as to provide reasonable notice of the conduct which is prohibited. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The conduct proscribed by (A)(4) is furnishing "legal managerial services" to a criminal syndicate with the requisite specific intent. As we have already indicated, sundry meanings may be attached to the phrase, "furnish legal . . managerial services."

Defendants cite the scienter element of the statute and deny that subsection (A)(4) is unduly vague. It is true that no criminal liability can attach under R.C. 2923.04 unless it is found that a person acted "with purpose to establish or maintain a criminal syndicate or to facilitate any of its activities." Specific intent, however, may be *inferred* from conduct. While the Supreme Court has held that some statutes must fall

as impermissibly vague in the absence of a scienter element, *Smith v. California*, 361 U.S. 147, 154–55, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), and while that Court has held that the presence of a scienter element *may* save a statute which otherwise would be unconstitutionally vague, see *Mishkin v. New York*, 383 U.S. 502, 510–511, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); *Screws v. United States*, 325 U.S. 91, 104, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Supreme Court has never to our knowledge held that the imposition of a scienter element upon a statute necessarily renders the statute's prohibitions sufficiently precise to withstand a vagueness challenge.

The scienter element in R.C. 2923.04 does little to limit the reach of the statute. The intent required is a "purpose to . . . facilitate *any* of [the criminal syndicate's] activities." As written, then, the scienter element is not limited to activities undertaken to facilitate the *illegal* activities of a criminal syndicate. This is important; a criminal syndicate may engage in many activities which are not in and of themselves illegal. Some such activities, such as reporting income for federal tax purposes, are in fact required by law. The discussion found in *Cramp v. Board of Public Instruction of Orange County*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) has some relevance here. The issue in *Cramp* was "whether a State can constitutionally compel those in its service to swear that they have never 'knowingly lent their aid, support, advice, counsel, or influence to the Communist Party.'" 368 U.S. at 285, 82 S.Ct. at 280. In a unanimous decision, the United States Supreme Court stated:

> Those who take this oath must swear . . . that they have not in the unending past ever knowingly lent their "aid," or "support," or "advice," or "counsel" or "influence" to the Communist Party. What do these phrases mean? . . . Could a lawyer who had ever represented the Communist Party or its members swear with either confidence or honesty that he had never knowingly lent his "counsel" to the Party? . . .

The very absurdity of these possibilities brings into focus the extraordinary ambiguity of the statutory language.

368 U.S. at 286, 82 S.Ct. at 280. We think these comments applicable to the scienter element of R.C. 2923.04. "With purpose . . . to facilitate any of [a criminal syndicate's] activities" is exceptionally broad language.

Let us assume, by way of example, that an Ohio organization numbering five or more persons receives substantial revenues from an illegal gambling operation. Under federal law, both legally obtained income and illegally obtained income must be reported to the Internal Revenue Service. *Commissioner v. Tellier*, 383 U.S. 687, 691, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). Aside from subsection (A)(4), nothing in the law prohibits an attorney from providing ordinary tax advice and assistance to such an organization, whether or not the lawyer knows the source of the revenue which is reported. Legal advice concerning federal income taxes can have a profound effect upon the management of any contemporary business. The result is that the tax lawyer, by providing otherwise lawful legal services, may well assist the syndicate in staying out of trouble with the revenue people, thereby necessarily "facilitating" the activities of the syndicate.

Because subsection (A)(4) fails to specify with reasonable clarity which kind or kinds of conduct it prohibits, the Court holds that the subsection is impermissibly vague under the Due Process Clause of the United States Constitution. Vagueness is not, however, the only pernicious shortcoming of this subsection. In our judgment, imposing criminal sanctions upon the rendering of legal services qua legal services carries a grave potential for impairing important rights under the First, Sixth and Fourteenth Amendments to the United States Constitution. When a legislature sets out to regulate activity which arguably falls within the reach of such fundamental constitutional rights, the prohibitions against vagueness tighten and the legislature is required to draft the penal statute

1052

with particularity and precision. See *Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *United Mine Workers of America v. Illinois Bar Association,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967).

In the *United Mine Workers* case, as in *Brotherhood of Railroad Trainmen v. Virginia State Bar,* 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), the United States Supreme Court held that the First Amendment to the United States Constitution affords protection to lay organizations which use the collective resources of their memberships to procure legal assistance for members who need it (*United Mine Workers*) or to channel such members to lawyers approved by the organization (*Trainmen*). The Supreme Court did not invoke the Sixth Amendment in these cases; the underlying litigation was civil in nature, and even in a criminal case the Sixth Amendment right to the assistance of counsel probably attaches no sooner than the accusatory stage of a criminal investigation. *Hoffa v. United States,* 385 U.S. 293, 309–310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Escobedo v. Illinois,* 378 U.S. 478, 490–491, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The constitutional right which the Supreme Court found applicable was the right to petition the courts, *Trainmen,* 377 U.S. at 7, 84 S.Ct. at 1117 (footnote omitted):

> Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries, cf. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 and for them to associate together to help one another to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics. The State can no more keep these workers from using their cooperative plan to advise one another than it could use more direct means to bar them from resorting to the courts to vindicate their legal rights. The right to petition the courts cannot be so handicapped.

Although the plaintiff organization in *Trainmen* asserted that its activities were protected by federal statute, the Supreme Court did not reach the statutory claim, 377 U.S. at 2 n.2, 84 S.Ct. 1113, and after the *United Mine Workers* decision it is clear that a plaintiff may invoke "associational rights," 377 U.S. at 8, 84 S.Ct. 1113 without citing a specific federal constitutional or statutory right which the plaintiff seeks to enforce. See *United Mine Workers,* 389 U.S. 217, 227 n.3, 88 S.Ct. 353, 19 L.Ed.2d 426 (Harlan, J., dissenting).

■ Because the sweep of R.C. 2923.-04(A)(4) is so ill-defined, and because of the relationship of record between Amusement Devices Association and its two plaintiff members, we hold that subsection (A)(4) violates these plaintiffs' First Amendment associational rights under the *Trainmen* and *United Mine Workers* cases. Ohio "undoubtedly has broad powers to regulate the practice of law within its borders; but we have had occasion in the past to recognize that in regulating the practice of law a State cannot ignore the rights of individuals secured by the Constitution." *Trainmen,* 377 U.S. at 6, 84 S.Ct. at 1116 (footnotes omitted).

Ohio regulates distributors and operators of pinball and other amusement devices with a number of penal enactments. There can be honest disagreement as to whether a particular machine is legal or not; thus, when the Supreme Court of Ohio held, in *Stillmaker v. Department of Liquor Control,* 18 Ohio St.2d 200, 249 N.E.2d 61 (1969), that certain bingo-scoring pinball machines were illegal under Ohio law, it reversed the decisions of two lower courts, see 13 Ohio App.2d 29, 233 N.E.2d 519, and drew two dissents, see 18 Ohio St.2d at 204, 249 N.E.2d at 64. Limiting the availability of pre-accusatory legal services to persons engaged in such a regulated field can have a substantial and direct impact upon the accusatory and post-accusatory stages of a criminal investigation.

■ We do not decide whether under such circumstances the reach of the Sixth Amendment can extend to the pre-accusa-

tory stage. In our judgment, the great command of the Due Process Clause of the Fourteenth Amendment to the United States Constitution is not limited, in the area of the right to assistance of counsel, to the bare confines of the Sixth Amendment. As Mr. Justice Frankfurter said in another context, "The 'due process of law' which the Fourteenth Amendment exacts from the States is a conception of fundamental justice. It is not satisfied by merely formal procedural correctness, nor is it confined by an absolute rule such as that which the Sixth Amendment contains in securing to an accused 'the Assistance of Counsel for his defence.'" *Foster v. Illinois*, 332 U.S. 134, 136, 67 S.Ct. 1716, 1717, 91 L.Ed. 1955 (1947) (citations omitted). We are convinced that it is fundamentally unfair for a state on the one hand to regulate with criminal sanctions certain modes of conduct, and on the other hand to enact a penal statute which, because of its breadth and its lack of definition, discourages the rendering of legal services to persons in the regulated field.

## V

■ Citing *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, defendants insist that whether or not plaintiffs' claims have merit, a federal court should not issue injunctive relief under the circumstances present here. We agree. Plaintiffs' claim that they will suffer immediate irreparable harm in the absence of injunctive relief is undercut somewhat by the fact that the special grand jury has been dissolved and its subpoenas duces tecum concerning plaintiff Amusement Devices Association have been quashed. Our reluctance to issue permanent injunctive relief against the defendant state officials is bolstered by our conviction that the Ohio prosecutorial authorities "will give full credence to this decision," *Roe v. Wade*, 410 U.S. 113, 166, 93 S.Ct. 705, 733, 35 L.Ed.2d 147 (1973), whether the relief granted is declaratory or injunctive in nature.

We believe that the present case falls squarely within the holding of *Steffel v.*

*Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In that case, the Supreme Court held that "regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute, whether an attack is made on the constitutionality of the statute on its face or as applied." 415 U.S. at 475, 94 S.Ct. at 1223 (footnote omitted). Distinguishing both *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), upon which defendants rely in this case, and *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Supreme Court stated, 415 U.S. at 472–73, 94 S.Ct. at 1222 (citations omitted):

> In the instant case, principles of federalism not only do not preclude federal intervention, they compel it. Requiring the federal courts totally to step aside when no state criminal prosecution is pending against the federal plaintiff would turn federalism on its head. When federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)—as they are here—we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights. But exhaustion of state remedies is precisely what would be required if both federal injunctive and declaratory relief were unavailable in a case where no state prosecution had been commenced.

The Supreme Court also stated that "engrafting upon the Declaratory Judgment Act a requirement that all of the traditional equitable prerequisites to the issuance of an injunction be satisfied before the issuance of a declaratory judgment is considered would defy Congress' intent to make declaratory relief available in cases where an injunction would be inappropriate." 415 U.S. at 471, 94 S.Ct. at 1222.

■ We hold, then, that plaintiffs are entitled to a declaratory judgment. The Court agrees with defendants when they assert that the State of Ohio is not a proper

**1054**

party defendant in this § 1983 action, see *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). For the reasons stated hereinabove, however, we cannot agree with defendants' assertion that R.C. 2923.-04(A)(4) passes constitutional muster. This subsection is impermissibly vague because it fails to define the conduct which it purports to proscribe. It is impermissibly overbroad because its reach encompasses conduct which is protected under the First and Fourteenth Amendments.

We do not decide whether the General Assembly of Ohio can regulate the practice of law with penal enactments. Nor do we hold that all purely legal services are constitutionally protected; it may be that legislation drafted with more precision could reach such activities without exceeding constitutional bounds. We do hold that R.C. 2923.04(A)(4) as now written does not survive constitutional review.