638 F.2d 916
 RECORD REVOLUTION NO. 6, INC., Plaintiff-Appellant,
v.
The CITY OF PARMA et al., Defendant-Appellee, (80-3308).
Alexander J. LUKA d/b/a Daystar Boutique, Plaintiff-Appellant,
v.
The CITY OF LAKEWOOD et al., Defendant-Appellee, (80-3352).
The RIGHT PLACE, INC., Plaintiff-Appellant,
v.
The CITY OF NORTH OLMSTED, OHIO et al., Defendant-Appellee, (80-3353).
 Nos. 80-3308, 80-3352 and 80-3353.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 20, 1980.
Decided Dec. 8, 1980.
 
 Fred P. Schwartz and Armond D. Budisch, Cleveland, Ohio, for plaintiff-appellant in Nos. 80-3352 and 80-3308.
 Anthony Glassman, Glassman & Browning, Inc., Beverly Hills, Cal., for amicus curiae.
 William E. Blackie, Lakewood, Ohio, for defendant-appellee in No. 80-3352.
 David C. Weiner and Eric Zagrams, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for plaintiff-appellant in Nos. 80-3353 and 80-3308.
 Dan Ryan, North Olmsted, Ohio, for defendant-appellee in No. 80-3353.
 Andrew Boyko, Stephen P. Bond, Parma, Ohio, for defendant-appellee in No. 80-3308.
 Before EDWARDS, Chief Circuit Judge, and BOYCE F. MARTIN, Jr., and JONES, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Business owners in the cities of Parma, Lakewood, and North Olmsted, Ohio have challenged the constitutionality of ordinances prohibiting the use, sale and manufacture of "drug paraphernalia."[1] The district court, in a very thoughtful and well written opinion, sustained the constitutionality of the ordinances after severing certain phrases and construing the meaning or scope of other language. Being convinced that parts of the ordinances are vague and overbroad, in violation of the First Amendment right to free speech and the Fourteenth Amendment right of due process, we reverse and enjoin enforcement of the ordinances.I.
 
 A. Rationale for Model Act
 
 2
 The "drug paraphernalia" ordinances in Parma, Lakewood, and North Olmsted are based almost verbatim on the Model Drug Paraphernalia Act drafted by the Drug Enforcement Administration of the United States Department of Justice. At the request of the Drug Policy Office of the President's Domestic Policy Council, DEA prepared the Model Act as an amendment to the Uniform Controlled Substances Act. In the Prefatory Note to the Model Act, DEA describes graphically the severity of the national problem to which the Model Act responds:
 
 
 3
 (T)he availability of Drug Paraphernalia has reached epidemic levels. An entire industry has developed which promotes, even glamorizes, the illegal use of drugs by adults and children alike. Sales of Drug Paraphernalia are reported as high as three billion dollars a year. What was a small phenomenon at the time the Uniform Act was drafted has now mushroomed into an industry so well-entrenched that it has its own trade magazines and associations.
 
 
 4
 The Justice Department determined that the law enforcement campaign against businesses selling drug paraphernalia should be fought mainly by state and local officials. Statement of Irvin B. Nathan, Deputy Assistant Attorney General, Criminal Division, before the H. R. Select Com. on Narcotics and Drug Abuse Control, November 1, 1979. The Model Act attempts to avoid or minimize the constitutional problems of previous statutes and municipal ordinances, yet to provide an effective law to curb the sale of drug paraphernalia.
 
 
 5
 Mr. Nathan strongly espoused the enactment of the Model Act by states and cities in his statement to the House Committee on Narcotics and Drug Abuse Control. He stated:
 
 
 6
 The positive features of such a bill are apparent. Outlawing the open advertisement and sale of drug paraphernalia will send a clear message to impressionable adolescents and others that society does not condone the use of drugs. Governmental authority will present a more consistent and reasoned face to the community by refusing to let the paraphernalia industry mock the law by thriving off the wide spread (sic) use of illegal drugs. Communities will no longer be offended by the presence of open symbols of illegal activity in their midst.
 
 
 7
 In closing, Mr. Nathan added several cautionary remarks on the potential problems of constitutionality and feasibility. First, he noted that "enforcement of such an act by state and local authorities may prove difficult and may divert scarce resources from more pressing drug concerns." Mr. Nathan further warned:
 
 
 8
 Even if there were resources to permit vigorous enforcement, there is a significant potential for mistakes and abuse by local authorities. There may be additional invasions of privacy if law enforcement personnel need see only an implement such as a pipe, rather than any actual evidence of the drug itself, in order to make an arrest and conduct a search. Moreover, the prevalence of drug paraphernalia may leave law enforcement personnel in the difficult position of having to engage in selective enforcement, with the potential for disparate treatment of similarly situated individuals.
 
 
 9
 He was concerned about the possibility of "increased public corruption" resulting from enforcement of the Act. He also questioned the potential effectiveness of drug paraphernalia statutes. Finally, Mr. Nathan listed several options in lieu of the comprehensive prohibition against the use, sale or manufacture of drug paraphernalia, such as licensing, zoning, forbidding sales to minors, and regulating the form of advertising.
 
 B. Structure of Model Act[2]
 
 10
 The Model Act contains two main sections. The first section sets forth at great length the definition of "drug paraphernalia." In the first subsection, drug paraphernalia is defined as anything which is "used, intended for use, or designed for use" in introducing controlled substances into the body. A number of specific examples are then given, each described by the phrase "used, intended for use, or designed for use." One example of drug paraphernalia is "testing equipment used, intended for use or designed for use in identifying or in analyzing the strength, effectiveness or purity of controlled substances." The list of examples concludes with the catchall category of "objects used, intended for use, or designed for use in ingesting, inhaling or otherwise introducing marihuana, cocaine, hashish, or hashish oil into the human body," followed by another list of thirteen items, such as water pipes, roach clips, chillums, and bongs.
 
 
 11
 The second subsection of the first main section of the Model Act delineates fourteen factors that a "court or other authority should consider, in addition to all other logically relevant factors," "in determining whether an object is 'drug paraphernalia.' " These factors include the statements by an owner about the item's use, prior convictions of the owner, national or local advertising and the existence of lawful uses for the item.
 
 
 12
 In sum, the Model Act uses three techniques to define "drug paraphernalia." First, it uses the repeated phrase "used, intended for use, or designed for use." Second, it lists by way of example a number of objects that could be drug paraphernalia. Third, the Model Act sets forth numerous factors to be considered in determining whether or not an object is drug paraphernalia.
 
 
 13
 Following the extensive definition of "drug paraphernalia," the second main section of the Model Act defines the substantive criminal offenses. The use, or the possession with intent to use, of drug paraphernalia is prohibited. Also proscribed is the delivery or manufacture of "drug paraphernalia," when the deliverer or manufacturer knows or should reasonably know that the drug paraphernalia will be used with controlled substances. The Model Act makes criminal the placing of any advertising in the print media promoting the sale of objects designed or intended for use as drug paraphernalia, when the person placing the advertising knows or should reasonably know the purpose of the advertisement. The Model Act provides for the civil forfeiture of all drug paraphernalia and a special offense for the delivery of drug paraphernalia to a minor. Finally, the Act states that its sections or subsections are severable; in the event that any part is declared unconstitutional the remaining parts can still be given effect.
 
 II.
 A. City of Parma Ordinance No. 242-79
 
 14
 The City of Parma, Ohio, has long expressed its desire to curb drug abuse in its community. In 1977, the Parma City Council enacted a resolution urging that the possession and private use of marihuana not be legalized. In 1978, Doris Krawczyk, Councilwoman in Parma, received a copy of a petition addressed to the manager of Parmatown Shopping Mall from constituents who were angry at the sale of novelty items, called drug paraphernalia, by the plaintiff in this case, Record Revolution No. 6, Inc. Krawczyk requested the city law department in April, 1978, to draft legislation to ban the sale of drug paraphernalia, but the law department advised her that "no basis or foundation" for legislation then existed. Krawczyk's interest in drug paraphernalia legislation revived in October, 1979, when she read an article on an ordinance enacted in Lakewood, California that banned the sale of drug paraphernalia to minors. Then on November 14, 1979, an editorial in The Cleveland Press informed her of the Model Drug Paraphernalia Act. She obtained a copy of the Model Act and requested the city law department to draft similar legislation.
 
 
 15
 On January 7, 1980, the Parma City Council enacted Ordinance No. 242-79,[3] which is almost identical to the Model Act.[4] The ordinance was passed as an emergency measure and became effective immediately upon the mayor's signature on January 9, 1980. The Parma City Council did not commission a study of the drug abuse problem, but based its conclusions on the need for the legislation on the personal experience of its members, the statements of DEA Administrator Peter Bensinger and Deputy Assistant Attorney General Nathan, and the testimony before the Council of two Parma police officers. Counsel for Record Revolution No. 6, Inc. testified against the enactment of the ordinance before the City Counsel.
 
 
 16
 On January 10, 1980, Record Revolution No. 6, Inc. filed an action in the federal district court alleging the unconstitutionality of the Parma Ordinance and seeking declaratory and injunctive relief. Record Revolution No. 6, Inc. is an Ohio corporation which sells retail records, magazines, jewelry, T-shirts, and "novelty items," such as various kinds of pipes. At a hearing on the temporary restraining order the next day, the City agreed not to enforce the ordinance until the district court reached a final decision on the merits. The district court held a consolidated hearing on the preliminary and permanent injunction on January 28 and 30, 1980. After allowing time for the submission of post-trial briefs, the district court issued its lengthy, comprehensive memorandum opinion on April 14, 1980.
 
 
 17
 The testimony at the injunction hearing can be summarized briefly. Francis Szabo, Chief of the Parma Police, testified that the police had notified the one retailer of suspected drug paraphernalia in Parma of the ordinance; the police had not been trained yet to enforce the ordinance; and no attempt at enforcement had been made.
 
 
 18
 Doris Krawczyk, through her in-court testimony and her deposition, stated that the ordinance was based entirely on the language and research of the Model Act. App. 662, 940-41, 976, 994. She also testified that she could not identify items which violated the ordinance and that such a determination was the responsibility of the police. In her opinion, the lawfulness or unlawfulness of an item turned on the purchaser's intent.
 
 
 19
 Clarence D. Bennett, Detective of the Parma Police with the duty of investigating organized crime and narcotics, testified that the ordinance would aid the fight against drug abuse, but that it still had not been enforced. He identified certain items as drug paraphernalia, such as all pipes with screens, all chamber pipes, small-bowled pipes, and very small pipes, and stated that the seller's intent could be inferred from the item itself. He would enforce the ordinance, when other common items were involved, only if residue of an illegal drug were discovered on the item. He also concluded that a policeman would not know how to enforce the ordinance with respect to circumstances in which the seller reasonably should have known that the purchaser would use the item with illegal drugs.
 
 
 20
 Herbert J. Bessai, pipe maker and retail merchant for 31 years, and a collector and appraiser of pipes, testified as an expert witness for plaintiff. According to his testimony, the design of a pipe gives no indication of whether it will be used for legal or illegal purposes. For example, he stated that water pipes have long been used to give the dryest, coolest smoke and that screens serve to keep the tobacco away from the moisture in the bottom of the pipe. He did say on cross-examination that he had never made a pipe out of plastic and that plastic pipes were normally sold in "head gear shops." He also stated on redirect examination that he was certain some of the pipes which he has sold have been used to smoke marijuana.
 
 
 21
 After Parma's motion for dismissal at the close of plaintiff's case was denied, Parma called two witnesses.[5] Charles J. Carter, Special Agent of the DEA in charge of the Cleveland office, testified that the drug paraphernalia ordinance would assist law enforcement efforts against drug abuse.
 
 
 22
 Richard Rutt, a detective in the narcotics unit of the Cleveland Police Department, testified as an expert in narcotics law enforcement. In his opinion, the drug paraphernalia ordinance would reduce drug abuse somewhat. He stated on cross-examination that the design of almost every item listed in § 620.01(L), such as a water pipe or a screen in a pipe, indicates an intent to design, sell or use the item with illegal drugs. However, he also testified that any pipe could be used to smoke marijuana, that he would not call Bessai's testimony incorrect, and that some sellers could believe in the lawfulness of an item on the basis of its patent.
 
 B. City of Lakewood Ordinance No. 5-80[6]
 
 23
 The City of Lakewood enacted its drug paraphernalia ordinance, Ordinance No. 5-80 on January 21, 1980. The Lakewood ordinance, before its amendment on April 21, 1980, was identical to the Parma ordinance, except that it did not provide a special offense for sales to minors. The amending Ordinance, No. 29-80, added this special offense and repealed original § 513.01(cc)(2)(K) in its entirety and the phrase "under circumstances where one reasonably should know" from § 513.04(b), (c).
 
 
 24
 The City of Lakewood participated as amicus curiae in the injunction hearing on the Parma ordinance. On May 6, 1980, after the district court issued its opinion sustaining the constitutionality of the Parma ordinance, Alexander Luka, doing business as Daystar Boutique in Lakewood, filed his complaint attacking the constitutionality of the Lakewood drug paraphernalia ordinance and requesting declaratory and injunctive relief. Daystar Boutique is a retail establishment similar to Record Revolution No. 6, Inc. No evidentiary hearing was held. The district court entered summary judgment on May 8, 1980 for defendants on the basis of its opinion in Record Revolution No. 6, Inc. v. City of Parma, 492 F.Supp. 1157.
 
 
 25
 C. City of North Olmsted Ordinance No. 80-28[7]
 
 
 26
 The City of North Olmsted enacted its drug paraphernalia ordinance, Ordinance No. 80-28, on May 6, 1980. Being an emergency measure, the ordinance became effective on May 7, when signed by the mayor. The North Olmsted ordinance is identical to the Parma drug paraphernalia ordinance as amended. On May 7, 1980, the Right Place, Inc., a retail establishment similar to Record Revolution No. 6, Inc., filed a complaint challenging the constitutionality of the North Olmsted drug paraphernalia ordinance and seeking declaratory and injunctive relief. No evidentiary hearing was held. The district court entered summary judgment for the defendants on the basis of its decision in Record Revolution No. 6, Inc. v. City of Parma, 492 F.Supp. 1157.
 
 D. District Court Opinion
 
 27
 The district court held that the Parma ordinance was not vague or overbroad as construed. The inclusion of "use, intended for use and designed for use" in the definition of "drug paraphernalia" in § 620.01(dd)(1) was held to save the ordinance from vagueness. The district court also construed § 620.01(dd) (1) to refer to the defendant's use, intent, or design. The district court declared that the ordinance does not make the items listed in § 620.01(dd)(1) (A)-(L) drug paraphernalia per se, since the element of the defendant's use, intent, or design must be proven. Finally, with respect to § 620.01, the district court ruled that subsection (K) was vague, because it created a danger of discriminatory and arbitrary enforcement. Therefore, the district court severed subsection (K) from § 620.01, pursuant to the severability clause in § 620.04(g).
 
 
 28
 The district court found § 620.04 not vague or overbroad, except for the phrase "reasonably should know" in § 620.04(b) and (c). The district court severed this phrase from those subsections. The district court held that the transferor's knowledge of the transferee's intended use of an item sufficiently protects the innocent and preserves the section from vagueness and overbreadth. In doing so, it rejected plaintiff's contention that due process required proof of specific intent. The district court construed § 620.04(c) to apply only to advertisements placed in Parma about "drug paraphernalia" available in Parma. As such, this subsection was held not to infringe upon speech protected by the First Amendment. The district court did not find any constitutional problem with § 620.04(d), (e), (f) and (h).7a
 
 E. Issues on Appeal
 
 29
 Plaintiffs raise four main arguments on appeal. First, they contend that the district court lacked the power to add to, sever, and construe the statutory language of the municipal ordinances. Second, the definition of "drug paraphernalia" is vague and overbroad, they argue, because the proscribed items are not adequately described and the definition relies on transferred intent. Plaintiffs' third contention is that the offenses are vague and overbroad because proof of specific intent is not necessary, knowledge can be inferred from facts which do not support the inference, and the proscription on advertising includes protected speech. Finally, they argue that the list of items in § 620.01(dd)(1)(A)-(L) creates mandatory or rebuttable presumptions, which do not rest on supportable inferences.
 
 
 30
 The plaintiffs have not appealed the district court's other conclusions of law, which held that the ordinances did not violate the equal protection clause, the commerce clause, the Fourth Amendment, the impairment of contracts clause, the bill of attainder clause, or the supremacy clause through federal pre-emption.
 
 
 31
 Parma contests two adverse rulings by the district court.[8] The district court held that it had subject matter jurisdiction, in that an actual case or controversy was present. Parma has filed a motion to dismiss this appeal for lack of an actual case or controversy. The district also denied Parma's motion to abstain in order to allow the state courts an initial opportunity to construe the ordinance.
 
 III.
 A. Case or controversy
 1) Threat of Prosecution
 
 32
 The City of Parma argues that this Court and the district court lack subject matter jurisdiction because plaintiff has not been threatened with prosecution under the drug paraphernalia ordinance.[9] Parma relies on the testimony of Police Chief Szabo and Councilwoman Krawczyk. According to their testimony, the ordinance has still not been enforced because Parma agreed to withhold enforcement pending the district court's hearing of the case. After that this Court granted an injunction pending appeal. They also testified that the ordinance would not be enforced until the police had been trained in its provisions and business owners had been given public notice.
 
 
 33
 Record Revolution No. 6, Inc. seeks a declaratory judgment and injunctive relief. Though the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, cannot remove the jurisdictional requirement of Article III, § 1 of the Constitution, a genuine threat of criminal prosecution under legislation that allegedly is constitutionally defective does present an actual case or controversy. Steffel v. Thompson, 415 U.S. 452, 458-59, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). The Declaratory Judgment Act represents Congress' judgment that, in these circumstances, it is unfair and may deter the exercise of constitutionally protected rights to compel a person to wait for an actual arrest or prosecution before allowing that person to test the legislation in court.
 
 
 34
 The facts in this case demonstrate that the threat of prosecution of Record Revolution No. 6, Inc. under the Parma drug paraphernalia ordinance is not "imaginary," "speculative," or "chimerical," and that the threat continues to exist at this stage of the proceedings. Id. at 459, 94 S.Ct. at 1215. Councilwoman Krawczyk's first reported desire to enact drug paraphernalia legislation arose from the receipt of a petition from her constituents protesting the sale of "drug paraphernalia" by Record Revolution No. 6, Inc. Krawczyk visited Record Revolution No. 6, Inc. and concluded that the store was selling drug paraphernalia. The ordinance explicitly decries the business activity of head shops. Though Krawczyk testified that the ordinance was not aimed at any particular store, she knew only one store, Record Revolution No. 6, Inc., that would be subject to the ordinance. The deposition testimony of Councilman Labutta and Detective Bennett confirms that Record Revolution No. 6, Inc., would be a primary target for enforcement of the ordinance. Police Chief Szabo stated that there is only one retailer in Parma subject to the ordinance and that this retailer had received notice of the ordinance. App. 644. According to Chief Szabo, he had not told Record Revolution No. 6, Inc., that the police had no intention of enforcing the ordinance. In fact, every testifying police officer identified as drug paraphernalia items sold by Record Revolution No. 6, Inc. The only reason for the lack of enforcement to date is the injunction pending appeal. Under these circumstances, Record Revolution No. 6, Inc. has plainly demonstrated a sufficient threat of prosecution to establish the presence of an actual case or controversy. See High Ol' Times Inc. v. Busbee, 621 F.2d 135, 139 (5th Cir. 1980); Tobacco Road v. City of Novi, 490 F.Supp. 537 (E.D.Mich., 1979); Riddle v. Clack, No. CA-3-77-0525-D (N.D. Tex., August 25, 1977).
 
 2) Mootness
 
 35
 Defendants' amendments of their ordinances to comply with the district court's opinion raises the question to mootness. We note, first, that the defendants have not completely harmonized their ordinances with the district court's opinion. The ordinances proscribe the placement of advertising in any printed material of prohibited items available anywhere. In contrast, the district court construed the ordinances to apply only to advertisements placed in printed material in the three cities about prohibited items available in the three cities. Also, North Olmsted and Parma, unlike Lakewood, deleted the phrase "or under circumstances where one reasonably should know" from § 620.04(b) only. The district court severed this phrase from § 620.04(c) as well.
 
 
 36
 Plaintiffs challenge the constitutionality of the ordinances as originally enacted and as amended. The continuing vitality of these ordinances prevents this case from being moot and distinguishes Indiana Chapter, NORML, Inc. v. Sendak, No. 80-1305 (7th Cir., July 22, 1980) (State of Indiana repealed statute in entirety while appeal pending).
 
 
 37
 Therefore, we hold that plaintiffs have demonstrated an actual case or controversy. Consequently, appellees' motion to dismiss this appeal for lack of subject matter jurisdiction is denied.
 
 B. Abstention
 
 38
 A substantial hurdle to the exercise of our jurisdiction is the branch of abstention doctrine elaborated in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[10] The Pullman doctrine counsels abstention in "narrowly limited special circumstances," "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979), quoting Kusper v. Pontikes, 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). To justify abstention, the questions of state law must be uncertain and amenable to a construction by the state courts that would resolve or substantially alter the federal constitutional issues. High Ol' Times, Inc. v. Busbee, 621 F.2d 135, 139 (5th Cir. 1980); D'Iorio v. County of Delaware, 592 F.2d 681, 686 (3d Cir. 1978). Another factor is whether the federal court's decision would unduly interfere with important state policies or regulatory programs. 621 F.2d at 139; 592 F.2d at 686.
 
 
 39
 As a general rule, abstention is not appropriate in cases challenging the constitutionality of a statute on grounds of vagueness and overbreadth, for the reasons that such statutes often are not subject to a saving construction, which would eliminate or narrow the federal constitutional issues, and that delayed resolution of state law questions implicating important federal constitutional rights should be avoided. Harman v. Forssenius, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965); 621 F.2d at 140 n.6; 592 F.2d at 692 n. 19. Also, the federal court should not abstain if lengthy, piecemeal litigation in the state courts would be necessary to define or resolve the issues of state law. Baggett v. Bullitt, 377 U.S. 360, 378, 84 S.Ct. 1316, 1326, 12 L.Ed.2d 377 (1964). These principles of abstention should be applied to effectuate the more general concerns of avoiding needless constitutional litigation and needless friction with state adjudication and policymaking. Moore v. Sims 442, U.S. 415, 427-30, 99 S.Ct. 2371, 2379-2381, 60 L.Ed.2d 994 (1979); Kusper v. Pontikes, 414 U.S. at 54, 94 S.Ct. at 306.
 
 
 40
 The district court did not state its reasons for denying the motion to abstain, but it did reach the correct result. The state court could not construe the ordinances to eliminate the problems of vagueness and overbreadth. The constitutional defect, which we will discuss later, in the definition "drug paraphernalia" necessarily infects the entire ordinance. Furthermore, the overbreadth of the proscription on advertising deters business owners from engaging in constitutionally protected conduct. Though the Ohio courts are very capable of applying federal constitutional principles, and can hear declaratory judgment actions, Ohio Rev. Code § 2721.03, their powers of construction are not limitless. State v. Young, 62 Ohio St.2d 370, 374, 406 N.E.2d 499, 502 (1980). The Ohio courts, like federal courts, cannot rewrite the language of a statute. Id. Only such judicial rewriting of the drug paraphernalia ordinances could save their constitutionality. This factor strongly undercuts the argument for abstention. Amusement Devices Ass'n v. Ohio, 443 F.Supp. 1040, 1048-49, (S.D. Ohio 1977) (3-judge district court).
 
 
 41
 Abstention is also inappropriate in these cases because the ordinances are challenged on their face and the questions raised are predominantly questions of federal constitutional law. Steffel v. Thompson, 415 U.S. at 474-75, 94 S.Ct. at 1223. The questions of state law have a very minimal impact on the issues before us. Finally, we must review the constitutionality of only one ordinance in each of three cities. Our decision will not disrupt a comprehensive state regulatory program or ongoing procedures in state agencies or state courts. Compare Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); Railroad Commission of Texas v. Pullman, Inc., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Parker v. Turner, 626 F.2d 1 (6th Cir. 1980).
 
 
 42
 Therefore, we hold that the Pullman doctrine does not require abstention from deciding the constitutionality of the drug paraphernalia ordinances.[11]
 
 IV.
 A. Lack of Power to Construe Ordinances
 
 43
 Before discussing the merits of the vagueness and overbreadth issues, we must first consider the extent of our power to give a saving construction to the drug paraphernalia ordinances. The district court construed the drug paraphernalia ordinances by adding to, deleting from and defining the statutory language. A federal court, however, has very limited powers in construing state statutes or municipal ordinances. For the federal court's interpretation of state or municipal legislation is "not binding on the state courts and may be discredited at any time thus essentially rendering the federal court decision advisory and the litigation underlying it meaningless." Moore v. Sims, 442 U.S. at 428, 99 S.Ct. at 2380. See State v. Young, 62 Ohio St.2d at 375 n.2, 406 N.E.2d at 503 (After citing to a federal court decision on the same state statute, the Ohio Supreme Court declared: This federal case is not binding upon this court, and we note the decision rendered in that case only as supporting authority). Consequently, a federal court must take the state statute or municipal ordinance as written and cannot find the statute or ordinance constitutional on the basis of a limiting construction supplied by it rather than a state court. Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). As stated in Hynes v. Mayor and Council of the Borough of Oradell, 425 U.S. 610, 622, 96 S.Ct. 1755, 1761, 48 L.Ed.2d 243 (1976), "(e)ven assuming that a more explicit limiting interpretation of the ordinance could remedy the flaws we have pointed out ... we are without power to remedy the defects by giving the ordinance constitutionally precise content." See also Smith v. Goguen, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974); Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972).[12] The proper course for a federal court to follow, if a limiting construction will save the constitutionality of a state statute or municipal ordinance and the statute or ordinance is fairly susceptible to such a construction, is to abstain pursuant to the Pullman doctrine.
 
 
 44
 The power of a federal court to sever sections or phrases from state legislation poses a slightly different problem of interpreting state law. In anticipation of litigation on the constitutionality of legislation, a state legislature or city council may provide expressly in the legislation for severability in the event that only parts of the legislation are declared unconstitutional. The task of the federal court, absent a controlling state decision, is to ascertain whether the unconstitutional parts of the legislation are so interwoven with the remainder of the statute that the remainder cannot stand alone. This is a question of the legislative intent and the interpretation of the legal effect of the remainder of the legislation standing by itself. Champlin Refining Co. v. Corporation Comm'n of Oklahoma, 286 U.S. 210, 234-35, 52 S.Ct. 559, 564-65, 76 L.Ed. 1062 (1932); Dorchy v. Kansas, 264 U.S. 286, 290-91, 44 S.Ct. 323, 324-25, 68 L.Ed. 686 (1924). See Emmons v. Keller, 21 Ohio St.2d 48, 254 N.E.2d 687 (1970). Abstention on the question of severability should be considered. Dorchy v. Kansas, 264 U.S. at 291, 44 S.Ct. at 325.
 
 
 45
 From these principles, it will become clear from our discussion of the issues that the district court, in its sincere desire to uphold the constitutionality of these municipal ordinances, exceeded the scope of its powers. The district court should have declared the ordinances unconstitutionally vague and overbroad on the basis of the defects that it found in the ordinances. Our reasoning and decision in this case is shaped by our lack of power to put a limiting construction on the municipal ordinances.
 
 B. Standards of Vagueness and Overbreadth
 
 46
 The due process clause of the Fourteenth Amendment includes the doctrines of void-for-vagueness and overbreadth. These two doctrines have distinct meanings and purposes, though a statute which is vague is also often overbroad. The void-for-vagueness doctrine commands any statute to give persons of common intelligence fair notice of the persons covered and the conduct proscribed. Colautti v. Franklin, 439 U.S. 379, 390-91, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979). Fundamental fairness, as well as a proper regard for preventing the deterrence of constitutionally protected conduct, requires that persons not be compelled to guess at their own peril the meaning and application of a statute. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Ascertainable standards of guilt are imperative in order to protect against arbitrary, erratic, and discriminatory arrests, prosecutions and convictions. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948). Unless the statute itself prescribes sufficiently precise standards, basic policy decisions are impermissibly delegated to the personal predilections of the police, prosecutors and juries. Smith v. Goguen, 415 U.S. at 575, 94 S.Ct. at 1248 (1974); Grayned v. City of Rockford, 408 U.S. at 108, 92 S.Ct. at 2298. "Legislators may not so abdicate their responsibilities for setting the standards of the criminal law." 415 U.S. at 575, 94 S.Ct. at 1248. Finally, a greater degree of precision is required when the statute defines criminal offenses or impinges on activities protected by the First Amendment. Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. at 620, 96 S.Ct. at 1760; Winters v. New York, 333 U.S. at 515, 68 S.Ct. at 670; Diebold, Inc. v. Marshall, 585 F.2d 1327, 1336 (6th Cir. 1978). But see Rose v. Locke, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975) (per curiam).
 
 
 47
 The overbreadth doctrine prohibits a statute from making innocent or constitutionally protected conduct criminal. Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). The statutory language may be very clear, yet "sweep unnecessarily broadly to invade the area of protected freedoms." Sawyer v. Sandstrom, 615 F.2d 311 (5th Cir. 1980). The harm from an overbroad statute is its chilling effect on constitutionally protected or otherwise lawful conduct.
 
 
 48
 C. Application to Drug Paraphernalia Ordinances
 
 1) Definition of Drug Paraphernalia
 
 49
 If the definition of "drug paraphernalia" is vague or overbroad in any respect, the ordinances must be declared unconstitutional. A precise and unambiguous definition of "drug paraphernalia" is critical because the ordinances seek to ban in certain circumstances only the sale of everyday items that have a myriad of innocent, lawful, and beneficial uses.[13] To pass constitutional muster, the ordinances must specify clearly the very limited circumstances in which the manufacture, sale or use of these common items is unlawful.
 
 
 50
 The key phrase used by the ordinances to separate lawful from unlawful items is "used, intended for use, or designed for use." The definition of "drug paraphernalia" turns on the state of mind of a person or his act with respect to an object. Plaintiffs contend first that the ordinances violate due process by allowing a defendant to be arrested, prosecuted and convicted on the basis of an act or state of mind of another person. For example, if the purchaser uses a pipe to smoke marijuana, do the ordinances permit the seller of the pipe to be arrested, prosecuted, or convicted on the basis of the purchaser's use? If the manufacturer intended that a chamber pipe be used for ingesting hashish, and the purchaser so uses the chamber pipe, do the ordinances permit the seller, who lacks such intent and did not use the chamber pipe himself to ingest hashish, to be arrested, prosecuted, or convicted on the basis of the manufacturer's intent and the purchaser's use?
 
 
 51
 These hypothetical questions explain the problem of transferred intent. The presence of transferred intent in the ordinances would infringe the due process clause by failing to give the defendant proper notice of the items defined to be drug paraphernalia and by convicting the defendant for another person's intent or misdeeds. The answer to the questions requires an understanding of the persons to whom the statute is directed. The description of the substantive offenses informs us that four categories of persons fall within the scope of the ordinances: manufacturers, wholesalers, retailers, and purchasers. Rather than specifically defining drug paraphernalia in terms of the state of mind or conduct of each category of person, the ordinances merely state the proscribed conduct or state of mind leaving the responsibility to the courts to apply the definitions to each category.
 
 
 52
 The reasoning of the district court demonstrates that the ordinances permit a person to be arrested, prosecuted or convicted only for that person's own use, intent, or design.[14] Due process requires this interpretation of the ordinances. Hammerle v. United States, 6 F.2d 144 (6th Cir. 1925) (per curiam). Its conclusion is bolstered by the comments to the Model Act, which refer consistently to the potential defendant as the "person in control" of the item.[15] Lest we be accused of exceeding the scope of our authority to construe the ordinances to save their constitutionality, it must be noted that Ohio law would allow no other interpretation of the ordinances. State v. Young, 62 Ohio St.2d at 376-77, 406 N.E.2d at 505-506; Chicone v. Liquor Control Comm'n of Ohio, 20 Ohio App.2d 43, 251 N.E.2d 864 (Ct.App.1969). Therefore, we can extrapolate the meaning of the ordinances on the question of whose use, intent, or design must be present to allow the arrest, prosecution or conviction of a person.
 
 
 53
 The statutory terms "use" or "intended for use" are not vague or overbroad. Their meaning, as commonly understood words of the English language, is clear. Amicus suggests that "use" is vague, because the ordinance does not delineate whether it proscribes the sale of the same item used by the seller with controlled substances or the same type of item. Also amicus contends that the ordinance is vague, because it does not state when, how long ago, or how often the item must have been used unlawfully.[16] Amicus Br. of Glassman & Browning, Inc., 4, 13, 21. These arguments raise very marginal problems in the application of the ordinances that do not suggest the vagueness or overbreadth of the ordinances in their definition of the normal, general class of offenses. United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 578-79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973); United States v. Petrillo, 332 U.S. 1, 6-7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947). In most cases, an item will be defined as drug paraphernalia on the basis of its use when the substantive offense on which the defendant was arrested and indicted is use of drug paraphernalia. Amicus' hypotheticals, which focus on use by the retailer and then delivery to a buyer seem improbable and farfetched. Even if such a sale would occur, the ordinances make clear the criminal offense of using an item with controlled substances and then transferring the item, knowing that the transferee will use the item with controlled substances. The resolution of amicus' marginal hypothetical situations must wait until an actual case arises.[17]
 
 
 54
 Therefore, we conclude that "used" and "intended for use" are not vague or overbroad in defining drug paraphernalia.[18]
 
 
 55
 The phrase "designed for use" is vague and overbroad.[19] The district court in Indiana Chapter, NORML, Inc. v. Sendak, supra, described well the unconstitutional ambiguity of this phrase:
 
 
 56
 The term "designed" could signify only devices that have no use or function other than as a means to ingest a controlled substance. Alternatively, "designed" could include any devices that have a legitimate function but could be used for ingestion of drugs. That is, the term "designed" could sweep into the definition of paraphernalia any device that could be altered from its normal function to become a makeshift drug device, such as a paper clip, tie bar, hand mirror, spoon, or piece of aluminum foil. The definition "designed for drug use" gives no hint to those attempting to comply with I.C. 35-48-4-8 what is included in the definition. The definition fails to make clear what items are included in the statutory prohibition and what items are not.
 
 
 57
 The comments to the Model Act indicate that the ordinances would apply to items which are not solely designed to be drug paraphernalia. Vagueness enters in our case once the ordinances begin to define drug paraphernalia in terms of the primary adaption or dominant purpose of the design. Then the definition begins to depend upon the ingenuity or purpose of the purchaser rather than the seller and upon the current practices of the clandestine society of drug users. Geiger v. City of Eagan, 618 F.2d 26 (8th Cir. 1980); Music Stop, Inc. v. City of Ferndale, 488 F.Supp. 390 (E.D.Mich., 1980).
 
 
 58
 The major ambiguity in defining drug paraphernalia in terms of the "design" of items is the lack of any design characteristics that distinguish lawful purposes from unlawful purposes. The type of object that can become, or be used as, drug paraphernalia is limited only by the imagination of the user. Geiger v. City of Eagan, 618 F.2d at 29. The record in our cases established the absence of any unique design characteristics.[20] Plaintiffs' expert, Herbert J. Bessai, testified that the size of a pipe, the presence of a screen or chamber in a pipe, the material from which the pipe is made, or the use of ice, water or air in a pipe does not indicate a design for unlawful use. He discussed in some detail the lawful uses of all of these design characteristics.[21] According to Bessai, the various designed pipes have been used lawfully for centuries. Rose v. Locke, 423 U.S. at 50, 96 S.Ct. at 244. Bessai's testimony, as the sole expert at trial on the making and smoking of pipes, stands unrefuted. When asked directly if Bessai's testimony was incorrect, Detective Rutt of the Cleveland Police Department's Narcotics Unit testified that he could not say Bessai was wrong. Consequently, we conclude that defining drug paraphernalia in terms of "design" is vague and overbroad.
 
 
 59
 The testimony of Detectives Bennett and Rutt, qualified experts on narcotics law enforcement, shows convincingly the danger of arbitrary and discriminatory enforcement of the ordinances by the police. Detectives Bennett and Rutt would arrest any retailer who sold pipes with screens or chamber pipes, despite the ability to use these pipes lawfully. Detective Rutt would arrest a retailer operating a "head shop" if it sold alligator clips or cigarette papers, but not a drug store owner selling the same items.[22] This testimony suggests that the ordinances would be enforced only against "head shops," as designated by the local law enforcement officials. No guidelines have been written to prevent such selective discriminatory enforcement. Because the ordinances would permit at least the arrest and prosecution of persons by police and prosecutors who claim to know drug paraphernalia when they see it, but cannot define it any more precisely in advance, the definition of drug paraphernalia is vague and overbroad.[23]
 
 
 60
 The vagueness and overbreadth in the definition of drug paraphernalia may reflect the failure of the legislators in Parma, Lakewood, and North Olmsted to investigate or study the drug paraphernalia industry. Parma Mayor Petruska, Councilwoman Krawczyk and Councilman Labutta each testified at deposition to their total lack of familiarity with drug paraphernalia and their inability to define it. Time and time again, they stated that the definition of drug paraphernalia was the responsibility of the police. The record shows beyond peradventure the legislators' conscious delegation of basic policymaking decisions to the police, prosecutors, and juries. Due process forbids such delegation of legislative responsibility. Smith v. Goguen, 415 U.S. at 575, 94 S.Ct. at 1248; Grayned v. City of Rockford, 408 U.S. at 108, 92 S.Ct. at 2298.
 
 
 61
 Because the definition of drug paraphernalia is vague and overbroad, the ordinances must be declared unconstitutional. The explicit terms of the ordinances, unlike the Model Act, limit severability to the section describing the substantive offenses. Therefore, the defective parts of the definition cannot be severed. Moreover, the vagueness and overbreadth of the definition infect the whole ordinance.
 
 
 62
 Other parts of the ordinances have also been spiritedly contested. Plaintiffs argue that the ordinances create an irrebuttable or rebuttable presumption that any item listed in subsection (L) of the definitional section is drug paraphernalia. They contend that the presumption, whether irrebuttable or rebuttable, is not supported by inferences based on fact. County Court of Ulster County v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
 
 
 63
 We agree with the district court that the listed items are not presumed to be drug paraphernalia. World Imports, Inc. v. Woodbridge Township, 493 F.Supp. at 432 (D.N.J.1980). Because the ordinances define drug paraphernalia in terms of its use, intended use or designed use, and because the phrase "such as" introduces the lists, the statutory language indicates that the listed items are only examples of items which could be drug paraphernalia. The comments to the Model Act also explain the list of items as "a detailed description of common forms of property that can fall within the definition of drug paraphernalia if used, intended for use, or designed for use to violate the drug laws." (emphasis added). The statements of Deputy Assistant Attorney General Nathan and DEA Administrator Bensinger would tend to confirm, when read as a whole, that the list of items is intended to serve as examples to help clarify the definition of drug paraphernalia. Furthermore, since the listed items have many lawful uses, it is evident that the list could serve only as an example of possible forms of drug paraphernalia. Interpreting the listed items as drug paraphernalia per se would clearly make the ordinances vague and overbroad.
 
 
 64
 The items listed in subsection (L) as common forms of drug paraphernalia are described clearly for the most part. Certain items, such as chillums, bongs, and carburetion tubes and devices, are probably not familiar to the ordinary businessman or consumer. The comments to the Model Act suggests the common usage and understanding of this terminology among drug users and drug merchants. Of course, the prosecutor would have to prove the existence of such trade argot and the defendant's understanding of it. Otherwise, the danger exists that a law-abiding businessman could be arrested, prosecuted, and convicted on the basis of definitions known only to drug merchants and users.
 
 
 65
 The purpose of listing the common forms of drug paraphernalia is to lend precision to the definition in order to give more specific notice to persons potentially subject to the ordinances. The descriptions of "roach clips" and "miniature cocaine spoons" do not fulfill this purpose. A roach clip is defined as any object that can be used to hold the short end of a burning marijuana cigarette. Only the imagination of the user limits the number of things fitting this definition. All of these things, such as alligator clips, tweezers, and paper clips, have predominantly lawful, beneficial uses. Thus, the description of roach clips does not identify the objects potentially covered by the ordinances. Moreover, prohibiting the use or sale of roach clips leads to absurd results. A smoker of a marijuana cigarette is potentially subject to a greater penalty for using a paper clip to finish smoking the butt, than for possession of the marijuana itself.
 
 
 66
 The description of a "miniature cocaine spoon" does not give any precision to the definition of drug paraphernalia. The testimony demonstrates that any spoon used for ingesting cocaine is very small. Does the ordinance intend to proscribe the miniature version of an already very small spoon? Another problem is simply the lack of any objective measure on the size of a spoon which falls within the definition of drug paraphernalia. Magnani v. City of Ames, 493 F.Supp. 1003 (S.D. Iowa, 1980); Music Stop, Inc. v. City of Ferndale, 488 F.Supp. at 393. But see: Tobacco Road v. City of Novi, supra. Again, the description of a "miniature cocaine spoon" does not fulfill the purpose of giving specific notice of the items prohibited by the ordinances.
 
 
 67
 The ordinances have included a list of "logically relevant factors" to be considered by the court, jury, prosecutor, and police in determining whether an object is "drug paraphernalia." Plaintiffs argue that several of the factors violate the state and federal rules of evidence. The drafters of the Model Act set forth this list to minimize the risk of arbitrary and discriminatory enforcement. They did not intend the list to supercede any rules of evidence or to interfere with the factfinding of the trier of fact. It is most likely that the Ohio courts would interpret the ordinance in the manner intended by the drafters of the Model Act.
 
 
 68
 Nevertheless, two comments are necessary on the proof of an offense under the drug paraphernalia ordinances.[24] First, it is most clear, from our previous discussion of design characteristics, that the defendant's intent for another person to use an item for the ingestion of controlled substances cannot be inferred from the item itself. Witnesses declared numerous times that the intended use of an object could be inferred from the object itself. However, because the objects have many lawful uses, and because the design characteristics do not distinguish objects intended for lawful use from objects intended for unlawful uses, the object by itself does not provide any basis for an inference of its intended use. Intent can be inferred from the defendant's statements to a purchaser, the manner in which the defendant display or advertised an item, or the instructions given by the defendant on the use of an item with drugs.
 
 
 69
 A second flaw in the list of "logically relevant factors" is the potential arrest, prosecution, or conviction of a person on the impermissible theory of guilt by association. See Templeton v. United States, 151 F.2d 706 (6th Cir. 1945). The factors include the proximity in time and space to a direct violation of the drug laws or to the presence of controlled substances, the statements of others, and the advertising of others. Thus, a retailer, for example, to avoid arrest, prosecution, or conviction, must continuously police the national and local media and the activities and statements of persons in the area of his store. The retailer could be safe from arrest on Monday morning when no one congregated near his store or the local narcotics dealer was on the other side of town, yet be very susceptible to arrest Monday afternoon when, unknown to the retailer, the narcotics dealer arrived around the corner from his store, attracting a group of persons who bought marijuana or other controlled substances and then came into his retail store to buy rolling papers, alligator clips, or pipes. In short, the ordinances permit events beyond the control of the retail owner to determine his guilt. The danger is that the ordinances could be applied to make a crime out of constitutionally protected or innocent conduct because of the actions or statements by persons other than the defendant. It is well established that guilt must be based on personal action, statements, or knowledge, not on association with other persons suspected of criminal conduct. Sawyer v. Sandstrom, 615 F.2d 311, 316-17 (5th Cir. 1980).[25] Because Ohio law naturally incorporates this principle of due process, we need not declare the list of logically relevant factors overbroad on its face. City of Cincinnati v. Hoffman, 31 Ohio St.2d 163, 166, 285 N.E.2d 714 (1972), cert. denied and appeal dismissed, 410 U.S. 920, 93 S.Ct. 1370, 35 L.Ed.2d 583 (1973).
 
 2) Offenses
 
 70
 Plaintiffs levy two attacks on the definition of the substantive offenses. First, plaintiffs contend that the standard of scienter must be "specific intent" to avoid the problem of vagueness. The ordinances provide for "knowledge" as the scienter requirement. Second, plaintiffs argue that the prohibition on advertising is overbroad in its coverage of area and its impact on content.
 
 
 71
 Scienter may save a statute from vagueness and overbreadth by providing fair notice of proscribed conduct and by distinguishing lawful from unlawful conduct. Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972); City of Columbus v. Schwarzwalder, 39 Ohio St.2d 61, 313 N.E.2d 798 (1974) (per curiam). However, scienter by itself may not be sufficient to save the constitutionality of a statute. "While the Supreme Court has held that some statutes must fall as impermissibly vague in the absence of a scienter requirement, ... and while that court has held that the presence of a scienter element may save a statute which otherwise would be unconstitutionally vague, ... the Supreme Court has never to our knowledge held that the imposition of a scienter element upon a statute necessarily renders the statute's prohibitions sufficiently precise to withstand a vagueness challenge." Amusement Devices Ass'n v. Ohio, 443 F.Supp. at 1050-51. Accord, State v. Young, 62 Ohio St.2d at 375-78, 406 N.E.2d at 503-505. Therefore, the effect of the scienter standard on the vagueness and overbreadth of a statute must be examined on a case-by-case basis in the context of the particular statute at issue.
 
 
 72
 The drug paraphernalia ordinances prohibit the delivery or manufacture, the possession with intent to deliver, and the manufacture with intent to deliver of drug paraphernalia, "knowing, or under circumstances where one reasonably should know," that it will be used with controlled substances.[26] The ordinances further make unlawful the placement of any advertisement in any printed publication "knowing, or under circumstances where one reasonably should know," "that the purpose of the advertisement, in whole or in part, is to promote the sale of objects intended for use or designed for use as drug paraphernalia." The ordinances do not define "knowledge" or "reason to know." Since municipal ordinances must be consistent with general state law, presumably the definition of "knowing" in Ohio Rev. Code § 2901.22(B) would pertain. According to this definition "(a) person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." The drafters of the Model Act would define "knowledge" similarly as "actual knowledge" or awareness of a "high probability" that a certain consequence will follow one's action.
 
 
 73
 The requirement of knowledge on the part of the defendant, when coupled with use or intended for use in the definition of drug paraphernalia, does provide adequate notice and does sufficiently prevent arrest, prosecution or conviction of persons for innocent activities or mistake. As stated by the district court, "convicting an individual of selling drug paraphernalia under the ordinance requires proof of distribution of an item by an individual who intends it for use with illegal drugs knowing that it will be so used. Clearly this is not an innocent transaction." Unlike Amusement Devices Ass'n v. Ohio, the knowledge is that of unlawful activities only. 443 F.Supp. at 1051. A person who acts with knowledge that the action will aid in criminal conduct can be held criminally responsible. United States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952).
 
 
 74
 Plaintiffs rely primarily on United States v. Bryant, 461 F.2d 912 (6th Cir. 1972) and Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) to argue that due process requires proof of specific intent to violate or aid in the violation of the drug laws. Specific intent, in the case of the drug paraphernalia ordinances, would be manufacture, delivery or sale of an item to another person with the intent that that person use the item unlawfully with controlled substances. Both Bryant and Screws are inapposite. Bryant holds that specific intent must be proven in a prosecution for aiding and abetting. Specific intent is necessary in such cases of derivative criminality, as Circuit Judge Learned Hand explained so well in United States v. Peoni, 100 F.2d 401 (2d Cir. 1938). However, the drug paraphernalia ordinances do not penalize persons for aiding another person to violate the drug laws. The person faces criminal liability for his own actions, such as sale or manufacture of items defined as drug paraphernalia, combined with knowledge that the individual to whom the drug paraphernalia was delivered will use it to ingest narcotics. Screws required proof of specific intent for violations of 18 U.S.C. §§ 241 and 242, because the range of constitutional rights protected by these criminal statutes was constantly changing. 325 U.S. at 104, 65 S.Ct. at 1036. In contrast, the drug paraphernalia ordinances are self-inclusive, and the problems of vagueness must be cured by precisely defining drug paraphernalia and the substantive offense.
 
 
 75
 Amicus argues, by proposing a hypothetical situation, that the requirement of knowledge is not sufficient to inform a person of the criminality of one's action:
 
 
 76
 A saleswoman working in the cosmetics section of a fashionable department store sells a beautiful compact to a well-dressed woman who, pleased with her new purchase, announces that the compact and mirror inside it will be perfect for holding and preparing cocaine. The saleswoman may have fair warning that her customer is planning to engage in illegal conduct but because of the vagueness of the Ordinance as to the items covered and the ordinarily innocent nature of the transaction, she in no sense can be said to have fair warning that her conduct is criminal.
 
 
 77
 Amicus Br. of Glassman & Browning, Inc. at 29.
 
 
 78
 Amicus overlooks the fact that a person is not guilty unless the item falls within the definition of drug paraphernalia. Thus, use or intent to use an item in connection with controlled substances must also be proven. In the hypothetical situation suggested by amicus, the absence of use or intended use by the sales clerk results in the compact not being drug paraphernalia as defined by the ordinances. The definition of drug paraphernalia in terms of "use or intended for use" adds in part the extra measure of protection sought by plaintiffs in arguing for a scienter requirement of specific intent.[27]
 
 
 79
 The "reason to know" standard is vague and overbroad.[28] The district court aptly remarked: "Defining the offense of knowingly distributing drug paraphernalia in terms of the weakness of an individual's ability to perceive rather than his criminal intent provides insufficient guidance to the distributors covered by this subsection and to those persons charged with the responsibility of enforcing it." See also: Knoedler v. Roxbury Township, 485 F.Supp. 990, 993 (D.N.J.1980). But see: World Imports, Inc. v. Woodbridge Township, 493 F.Supp. at 433.[29] Detective Bennett testified that the police would not know how to enforce the "reason to know" standard. Because most uses of the outlawed items are lawful and common, the "reason to know" standard is too open-ended and too susceptible to misapplication to satisfy the dictates of due process.[30]
 
 
 80
 Plaintiffs contend that the prohibition of advertising, which promotes, in whole or in part, the use or sale of drug paraphernalia, unnecessarily infringes on the First Amendment right of free speech. The ordinances are drafted with a broad brush to apply to any person, publisher, printer or advertiser, who places an advertisement in the print media. The ordinances also apply without limitation to the location of the placement of the advertisements or the location at which the advertised items are available. Plaintiffs argue that the ordinances also would proscribe protected speech debating the current drug laws or extolling virtues of the use of drugs. Defendants reply that the limitations on their organic jurisdiction under state law must be read into the language of the ordinances, and that, consequently, the ordinances do not exceed permissible bounds with respect to the location of the prohibited acts. Defendants argue that the prohibition of advertising is constitutional, because only the advertising of illegal activity is proscribed.
 
 
 81
 Commercial speech is deserving of First Amendment protection. Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). However, the different nature of commercial speech from noncommercial speech circumscribes to some extent the measure of First Amendment protection afforded it. For example, the overbreadth doctrine permitting jus tertii and the prohibition against prior restraints have no force in the context of commercial speech. Id. 100 S.Ct. at 2350 n.6, n.8; Friedman v. Rogers, 440 U.S. 1, 10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979). After some initial confusion on the degree of protection to be given commercial speech, the Supreme Court in Central Hudson Gas & Elec. Corp. stated the definitive rule:
 
 
 82
 In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
 
 
 83
 100 S.Ct. at 2350.
 
 
 84
 Our first question is whether the ordinances prohibit only unlawful activity.[31] The ordinances forbid the use, sale, or manufacture of drug paraphernalia. Because the force of each ordinance stops at the city limits, the use, sale or manufacture of drug paraphernalia is unlawful only in Parma, Lakewood, and North Olmsted. Consequently, the ordinances may prohibit the placement of advertisements only within the city limits about "drug paraphernalia" available within the city limits. The ordinances, as now drafted, could infringe on protected speech in at least three different ways. First, the ordinances could be enforced against advertisers or publishers who place advertisements in printed media that circulates in other cities as well as Parma, Lakewood, and North Olmsted. Second, the ordinances could prevent the residents of these three cities from receiving information about the availability of items, defined by the ordinances as drug paraphernalia, in other cities that do not prohibit the use, sale or manufacture of those items. Bigelow v. Virginia, 421 U.S. 809, 824-25, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975). Third, the ordinances' use of the words "promote in part" may allow the ban of speech discussing the reform of drug laws or speech glorifying the drug culture. See Amusement Devices Ass'n v. Ohio, 443 F.Supp. at 1051 ("facilitate"). Though the comments to the Model Act indicate that such speech would not be proscribed, the statutory language on its face is not so restricted. Thus, we conclude that the ordinances do penalize protected speech.
 
 
 85
 The regulatory interest of Parma, Lakewood and North Olmsted in stopping drug abuse is plainly substantial. Also, the broad regulation would seem to advance this interest directly, though its effectiveness may be questioned. Thus, we arrive at the critical question of whether the broad prohibition is more extensive than necessary to serve this interest. That the ordinances would substantially curtail a broad range of protected speech cannot be disputed. Also, the ordinances clearly reach beyond the city limits. The cities can legitimately protect their citizens from the use, sale, or manufacture of "drug paraphernalia" within city limits. However, an impenetrable wall against the free flow of commercial speech cannot be erected around the cities' residents. The cities' interest in regulation of advertising is limited to preventing the sale of drug paraphernalia inside their municipal boundaries. Their legitimate interest does not include regulating the information heard or read by their citizens about the availability of legal "drug paraphernalia" in other locales. Bigelow v. Virginia, 421 U.S. at 827, 95 S.Ct. at 2235. Hence, the ordinances exceed the scope of the legitimate interest of Parma, Lakewood, and North Olmsted in prohibiting the advertising of drug paraphernalia. As the state courts could not provide a saving construction of the ordinances without substantial rewriting, we must declare this subsection of the ordinances unconstitutional for violating the First Amendment right of free speech.[32]
 
 VI.
 
 86
 The final issue is the propriety of injunctive relief in addition to declaratory relief. Proper regard for the principles of federalism obligate federal courts to grant the relief which will intrude least on the enactment and enforcement of state criminal laws. Yet while sitting in equity, a federal court also has the duty of awarding the successful plaintiff full and effective relief. "At the conclusion of a successful federal challenge to a state statute or local ordinance, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975). However, injunctive relief will be granted if plaintiff has made "a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." Wooley v. Maynard, 430 U.S. 705, 712, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977), quoting Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935). See also Douglas v. City of Jeanette, 319 U.S. 157, 163-64, 63 S.Ct. 877, 880-81, 87 L.Ed. 1324 (1943). Injunctive relief is often warranted when the plaintiff seeks prospective relief against possible future state proceedings in order to alleviate the present deterrent effect of the state statute or local ordinance on his constitutionally protected or otherwise lawful conduct. Steffel v. Thompson, 415 U.S. at 463 n.12, 94 S.Ct. at 1218 n.12. The crux of the inquiry is a showing of irreparable injury necessitating equitable relief, despite the countervailing values of federalism.
 
 
 87
 The irreparable injury to the plaintiffs' businesses is unquestionable. They do face a genuine threat of arrest and prosecution if the injunctions were vacated. The threat of enforcement of the ordinances would compel plaintiffs to forego a substantial part of their business. Moreover, the ordinances infringe impermissibility on the protected commercial speech of plaintiffs. Plaintiffs seek only prospective relief against local ordinances that have never been enforced. We have found the ordinances to be constitutionally defective in several significant respects. Therefore, we hold that the award of injunctive relief is necessary to protect plaintiffs' constitutional rights.
 
 
 88
 The grant of injunctive relief does not reflect any disrespect for the city officials or any concern on our part that the municipalities would not comply with a declaratory judgment. Defendants have exhibited considerable solicitude throughout the proceedings in federal court for the protection of the constitutional rights of plaintiffs. The defendants acted expeditiously to conform their ordinances to the district court's opinion, though their efforts fell a little short of full conformity. We harbor no doubts that the municipal officials will continue to perform their duty to safeguard the public safety and welfare with due respect for the constitutional principles that have served our nation well for over two hundred years.
 
 
 89
 Our opinion questions not the laudable goals of the cities' elected officials, but the means chosen to implement their goals. We are most cognizant of the serious problem of drug abuse long existing in our nation. We hold only that the drug paraphernalia ordinances fail the test of precision demanded by the First and Fourteenth Amendments of the Constitution.
 
 V.
 
 90
 The judgment of the district court is reversed and the case is remanded for issuance of a permanent injunction prohibiting the enforcement of the drug paraphernalia ordinances in the cities of Parma, Lakewood, and North Olmsted.
 
 ADDENDUM
 ORDINANCE NO. 242-79
 
 91
 BY: DORIS KRAWCZYK, GERALD BOLDT, FRANK HOUDEK, EVELYN KOPCHAK, JACK KRISE, VICTOR LABUTTA, JOSEPH MOLODEC, WILLIAM OBUCH
 
 
 92
 AN ORDINANCE ENACTING NEW SECTIONS 620.01(dd) AND 620.04 TO THE CODIFIED ORDINANCES OF THE CITY OF PARMA, PROHIBITING THE SALE OF DRUG RELATED PARAPHERNALIA, AND DECLARING AN EMERGENCY
 
 
 93
 WHEREAS, this Council has become aware of and is concerned over the general proliferation of "head shops" engaged in the sale of paraphernalia associated with drug use; and
 
 
 94
 WHEREAS, this Council finds that such establishments serve only to entice young people to abuse substances which are known to be harmful and unsafe for human consumption; and
 
 
 95
 WHEREAS, this Council finds that this situation has created a problem of such large proportion as to necessitate further legislation on the subject; Now, Therefore, BE IT ORDAINED BY THE COUNCIL OF THE CITY OF PARMA, STATE OF OHIO:Section 1. That Codified Ordinance 620.01, as enacted by Ordinance 228-75, passed February 2, 1976, is hereby amended by adding the following language:
 
 
 96
 "620.01 DEFINITIONS.
 
 
 97
 (dd)(1) "Drug Paraphernalia" means all equipment, products and materials of any kind which are used, intended for use, or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of this Chapter. It includes, but is not limited to:
 
 
 98
 (A) Kits used, intended for use, or designed for use in planting, propagating, cultivating, growing or harvesting of any species of plant which is a controlled substance or from which a controlled substance can be derived;
 
 
 99
 (B) Kits used, intended for use, or designed for use in manufacturing, compounding, converting, producing, processing, or preparing controlled substances;
 
 
 100
 (C) Isomerization devices used, intended for use, or designed for use in increasing the potency of any species of plant which is a controlled substance;
 
 
 101
 (D) Testing equipment used, intended for use, or designed for use in identifying, or in analyzing the strength, effectiveness or purity of controlled substances;
 
 
 102
 (E) Scales and balances used, intended for use, or designed for use in weighing or measuring controlled substances;
 
 
 103
 (F) Diluents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose and lactose, used, intended for use, or designed for use in cutting controlled substances;
 
 
 104
 (G) Separation gins and sifters used, intended for use, or designed for use in removing twigs and weeds from, or in otherwise cleaning or refining, marihuana;
 
 
 105
 (H) Blenders, bowls, containers, spoons and mixing devices used, intended for use, or designed for use in compounding controlled substances;
 
 
 106
 (I) Capsules, balloons, envelopes and other containers used, intended for use, or designed for use in packaging small quantities of controlled substances;
 
 
 107
 (J) Containers and other objects used, intended for use, or designed for use in storing or concealing controlled substances;
 
 
 108
 (K) Hypodermic syringes, needles and other objects used, intended for use, or designed for use in parenterally injecting controlled substances into the human body;
 
 
 109
 (L) Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing marihuana, cocaine, hashish, or hashish oil into the human body, such as:
 
 
 110
 (i) Metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;
 
 
 111
 (ii) Water pipes;
 
 
 112
 (iii) Carburetion tubes and devices;
 
 
 113
 (iv) Smoking and carburetion masks;
 
 
 114
 (v) Roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;
 
 
 115
 (vi) Miniature cocaine spoons, and cocaine vials;
 
 
 116
 (vii) Chamber pipes;
 
 
 117
 (viii) Carburetor pipes;
 
 
 118
 (ix) Electric pipes;
 
 
 119
 (x) Air-driven pipes;
 
 
 120
 (xi) Chillums;
 
 
 121
 (xii) Bongs;
 
 
 122
 (xiii) Ice pipes or chillers;
 
 
 123
 2. In determining whether an object is "Drug paraphernalia," a court or other authority should consider, in addition to all other logically relevant factors, the following:(A) Statements by an owner or by anyone in control of the object concerning its use;
 
 
 124
 (B) Prior convictions, if any, of an owner, or of anyone in control of the object, under any City, State, or Federal law relating to any controlled substance;
 
 
 125
 (C) The proximity of the object, in time and space, to a direct violation of this Chapter;
 
 
 126
 (D) The proximity of the object to controlled substances;
 
 
 127
 (E) The existence of any residue of controlled substances on the object;
 
 
 128
 (F) Direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object to deliver it to persons whom he knows, or should reasonably know, intend to use the object to facilitate a violation of this Chapter; the innocence of an owner or of anyone in control of the object, as to a direct violation of this Chapter shall not prevent a finding that the object is intended for use, or designed for use as "Drug paraphernalia;"
 
 
 129
 (G) Instructions, oral or written, provided with the object concerning its use;
 
 
 130
 (H) Descriptive materials accompanying the object which explain or depict its use;
 
 
 131
 (I) National and local advertising concerning its use;
 
 
 132
 (J) The manner in which the object is displayed for sale;
 
 
 133
 (K) Whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products;
 
 
 134
 (L) Direct or circumstantial evidence of the ratio of sales of the object(s) to the total sales of the business enterprise;
 
 
 135
 (M) The existence and scope of legitimate uses for the object in the community;
 
 
 136
 (N) Expert testimony concerning its use.
 
 
 137
 ..."
 
 
 138
 Section 2. That there is hereby enacted a new section 620.04 of the Codified Ordinances of the City of Parma which shall read as follows:
 
 
 139
 "620.04 POSSESSION, MANUFACTURE, AND SALE OF DRUG PARAPHERNALIA.
 
 
 140
 (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this Chapter.
 
 
 141
 (b) It is unlawful for any person to deliver, sell, possess with intent to deliver or sell, or manufacture with intent to deliver or sell, drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this Chapter.
 
 
 142
 (c) It is unlawful for any person to place in any newspaper, magazine, handbill, or other publication any advertisement, knowing, or under circumstances where one reasonably should know, that the purpose of the advertisement, in whole or in part, is to promote the sale of objects designed or intended for use as drug paraphernalia.
 
 
 143
 (d) Any person 18 years of age or over who violates paragraph (b) by delivering drug paraphernalia to a person under 18 years of age who is at least 3 years his junior is guilty of a special offense.
 
 
 144
 (e) This section does not apply to manufacturers, practitioners, pharmacists, owners of pharmacies and other persons whose conduct was in accordance with Ohio R.C. Chapters 3719, 4715, 4729, 4731 and 4741. This section shall not be construed to prohibit any possession, manufacture, or use of hypodermics made lawful by Section 620.09 of the Codified Ordinances.
 
 
 145
 (f) Any drug paraphernalia used in violation of this section shall be seized and forfeited to the Municipality.
 
 
 146
 (g) If any provision of this section or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section which can be given effect without the invalid provision or application, and to this end the provisions of this section are severable.
 
 
 147
 (h) Whoever violates any of the provisions of paragraphs (a), (b), or (c) is guilty of a misdemeanor of the second degree. If the offender has previously been convicted of a violation of paragraphs (a), (b), or (c), any subsequent violation of the same paragraph is a misdemeanor of the first degree. Whoever violates any of the provisions of paragraph (d) is guilty of a misdemeanor of the first degree."
 
 
 148
 Section 3. That Section 620.04 of the Codified Ordinances, as enacted by Ordinance 228-75, passed February 2, 1976, be, and hereby it is, repealed.
 
 
 149
 Section 4. That this Ordinance is hereby declared to be an emergency measure necessary for the immediate preservation of the public health, safety and welfare of the City of Parma, and for the further reason that sale and use of drug paraphernalia is a presently-existing and serious danger to youths which requires immediate regulation, and this Ordinance shall become immediately effective upon receiving the affirmative vote of two-thirds of all members elected to Council and approval of the Mayor, otherwise from and after the earliest period allowed by law.
 
 
 
 [1]
 The three cases have been consolidated on appeal
 
 
 [2]
 The entire ordinance as codified in Parma before its amendment is reprinted as an Addendum to our opinion
 
 
 [3]
 The ordinance is codified as §§ 620.01(dd) and 620.04 of the codified ordinances of Parma, Ohio
 
 
 [4]
 The Parma ordinance added the term "sell" to § 620.04(b); added all of § 620.04(e), which exempts certain medical and other individuals from the ordinance; and limited the severability clause in § 620.04(g) to § 620.04
 
 
 [5]
 Bernard Survoy, Clerk of the Parma City Council, was also called as a witness. The attorneys then stipulated to his testimony on the authenticity of the Parma ordinance
 
 
 [6]
 The ordinance is codified as §§ 513.01(cc) and 513.04 of the General Offenses Code of the Codified Ordinances of the City of Lakewood
 
 
 [7]
 The ordinance is codified at §§ 513.01(bb) and 513.04 of the Codified Ordinances of the City of North Olmsted
 7a On May 5, 1980, the City Council of Parma amended its drug paraphernalia ordinance to agree in part with the district court's opinion. The amending ordinance, No. 103-80, repealed the original § 620.01(dd)(2)(k) and the phrase "under circumstances where one reasonably should know" from § 620.04(b) only.
 
 
 [8]
 Though defendants-appellees did not file a cross-appeal, they are permitted to advocate any ground in the record that will require affirmance of the district court's judgment
 
 
 [9]
 Lakewood and North Olmsted have not challenged the subject matter jurisdiction of this Court or the district court
 
 
 [10]
 Since no state criminal prosecution is pending against plaintiffs, we do not face a question of abstention under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny
 A separate question, which we shall address later, is the propriety of granting injunctive relief as opposed to simply awarding a declaratory judgment.
 
 
 [11]
 Accord, High Ol' Times, Inc. v. Busbee, 621 F.2d 135, 139 (5th Cir. 1980); Indiana Chapter, NORML, Inc. v. Sendak, No. TH 75-142-C (S.D. Ind., February 4, 1980) (3-judge district court), vacated as moot at the time of appeal, No. 80-1305 (7th Cir., July 22, 1980); Record Museum v. Lawrence Township, 481 F.Supp. 768 (D.N.J. 1979)
 
 
 [12]
 In Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) the Court stated that a federal court could "extrapolate" the "allowable meaning" of a municipal ordinance. The Court found that the state court would construe the ordinance narrowly and concluded that the statutory prohibitions were clear, though the language permitted some flexibility. In effect, the Court declared that the language of the ordinance, as it read the ordinance and the state court would read the ordinance, was not vague. The Court did not add, delete or narrow statutory terms. The fine line between "extrapolation" and "construction" was recognized: " 'Extrapolation,' of course, is a delicate task, for it is not within our power to construe and narrow state laws." Id. at 110, 92 S.Ct. at 2299
 
 
 [13]
 The definition of "drug paraphernalia" includes "all equipment, products and materials of any kind."
 
 
 [14]
 App. 1511, 512-13. The district court opined:
 As a general rule, a crime consists of two elements: (1) an act or omission, and (2) a state of mind mens rea. Although the mens rea of an offense may differ from crime to crime, the general state of mind required is an intent to perform the criminal act. Of course, the mens rea and the act must occur simultaneously and the intent must be that of the criminal defendant. Because the definition of drug paraphernalia is referenced in each of the criminal offenses described in this Ordinance, it is an element of each of these offenses. Specifically, the criminal intent used to define drug paraphernalia is an element of the mental state required to convict under this Ordinance. Therefore, the pertinent intent must be that of the individual charged with having committed one of the offenses described in section 620.04(a)-(d). The court concludes that "black-letter" criminal law and the intent of the MDPA draftsmen compel the conclusion that the definition of drug paraphernalia must be interpreted in terms of the criminal defendant's intent and that this construction is reasonable and sensible.
 Defining all drug paraphernalia in terms of the state of mind of the seller of the item, does not solve the problem of transferred criminal intent. For example, if a manufacturer is prosecuted under section 620.04(b) and the term "drug paraphernalia" is defined in terms of the seller's intent, as Parma suggests, the manufacturer of an innocent item would be subject to criminal punishment because the seller intends it to be used with illegal drugs. The Ordinance regulates the following categories of conduct: use of paraphernalia with illegal drugs, possession of paraphernalia with intent to so use, placement of certain drug paraphernalia advertisements, and manufacture of paraphernalia for sole use with drugs.
 Therefore, defining all drug paraphernalia in terms of the intent of an individual classifiable in any one of these categories would cause a transferred intent problem whenever the definition was applied to the allegedly criminal conduct of individuals in one of the other categories. For this reason the court's construction, defining drug paraphernalia in terms of the intent of the individual charged with violating the Ordinance, is more reasonable and sensible.
 App. 511-13 (Footnote deleted).
 
 
 [15]
 The district court correctly rejected the testimony of Councilwoman Krawczyk and others on this point by ruling that the ordinance speaks for itself. App. 511-12, 671
 
 
 [16]
 Amicus argues that this vagueness leads to absurd results, by proposing the following hypothetical:
 Two defendants sell antique ashtrays to customers who they know will use the ashtrays in conjunction with marijuana. Neither defendant intends that the antique ashtray be used in connection with illegal drugs, and neither has designed the ashtray for use with illegal drugs, but one of them, a former marijuana smoker, has actually used the ashtray himself, several years prior to the sale at issue, for holding the butts of marijuana cigarettes. If both are prosecuted for a violation of § 620.04(b), one will presumably be found innocent (for element no. 2 will not have been satisfied) while the other, the former marijuana user, will presumably be guilty. This result would follow even though both had precisely the same intent and knowledge.
 Amicus Br. of Glassman & Browning, Inc., 13.
 
 
 [17]
 We need not address on this appeal the potential problems of double jeopardy and of inconsistency with the Ohio statute on possession of marijuana that may arise upon a criminal conviction under these ordinances
 
 
 [18]
 The ordinances of Parma, Lakewood and North Olmsted avoid the problems of vagueness created by defining drug paraphernalia in terms of customary or ordinary use. This latter definition imposes an impossible duty on a person to ferret out the use of an item that may normally be used in underground, illegal activity. Record Museum v. Lawrence Township, 481 F.Supp. 768 (D.N.J.1979); Riddle v. Clack, No. CA-3-77-0525-D (N.D.Tex., August 25, 1977). This flawed definition also imposes liability on a defendant for the use of an item by another, without the defendant knowing, intending, or participating in that use. Id.; Bambu Sales, Inc. v. Gibson, 474 F.Supp. 1297, 1305 (D.N.J.1979)
 
 
 [19]
 The district court concluded otherwise:
 Although many if not all of the items described in the Ordinance, as well as those introduced as evidence, have numerous legitimate uses, it is possible that an item which has an innocent use may be proved to have been designed for use with illegal drugs. As District Judge Boyle noted in her analysis of the evidence presented in Tobacco Road v. City of Novi, 490 F.Supp. 537 (E.D.Mich.; 6/21/79):
 Defendant also presented two tobacconists who testified that "paraphernalia" was the trade name for accessories intended to be sold for use with controlled substances. Reviewing the Nalpac catalogues, with which each witness was familiar, both identified many pipes which they described as unsuitable for tobacco use and designed for use with controlled substances. These opinions were based on the size of the bowl, the material of the pipe; and the absence of a stem, among other factors. Each witness testified that small-bowl pipes produce a short smoking period while tobacco smokers customarily seek long-smoking pipes and that non-porous materials, such as metal, glass, and acrylic, were unsuitable for tobacco smoking since they condensed rather than absorbed the moisture generated by lengthy pipe smoking. Each witnesses (sic) further testified that certain items in the catalogue such as razor blades and a "coke" mirror had absolutely no use in the tobacco industry.
 Defendant's evidence, on the other hand, established that there are items clearly identifiable as being primarily adapted or designed for the use of controlled substances. Indeed, it is inferable that such items are clearly identified both by manufacturers and by retailers for the commercial purpose of marketing the items to be used with controlled substances.
 This court does not share the concern that the Indiana District Court expressed in NORML v. Sendak, supra, at 12, that the phrase "designed for use" is not of sufficient clarity to meet the mandate of due process. An item is designed for use with illegal drugs within the meaning of this Ordinance if the defendant intentionally that is voluntarily and not because of mistake or other innocent reason designed or adapted it for use with drugs, regardless of any innocent alternative uses.
 App. 533.
 However, the fact that some items may have a design solely adapted for use with illegal drugs does not save the ordinances as drafted from vagueness and overbreadth.
 
 
 [20]
 The district court erred in disregarding the evidence in the record in these cases, and in relying on evidence presented in another case that was not before it. App. 533 (footnote 5 of district court opinion)
 
 
 [21]
 The district court credited Bessai's testimony, but did not use the testimony to find the definition of drug paraphernalia vague or overbroad. App. 534 (footnote 6 of the district court's opinion)
 
 
 [22]
 Note the bootstrapping nature of this definition of drug paraphernalia, because Detective Rutt defined a head shop as a store selling drug paraphernalia. App. 844
 
 
 [23]
 In World Imports, Inc. v. Woodbridge Township, 493 F.Supp. 428 (D.N.J.1980), the district court declared:
 A number of retail stores commonly called headshops (sic) specialize in selling drug paraphernalia. Only the naive or duplicitous would contend that sales of drug paraphernalia by headshops were intended primarily for such innocent purposes as making a lamp from a water pipe, fashioning an article of personal adornment from a cokespoon or feeding wounded birds with syringes and eyedroppers. The purpose of a headshop is to capitalize upon, to perpetuate and augment the current interest, particularly among the young, in items which are obviously intended for the use with illegal drugs.
 Tr: 9-10 (oral opinion upholding constitutionality of drug paraphernalia ordinance based on Model Act). This sentiment is the driving motivation and the practical theory behind the drug paraphernalia ordinances. Though based on fact, such an opinion does not resolve the problem of vagueness in defining drug paraphernalia, especially where the record evidence established the absence of design characteristics peculiar to use with controlled substances.
 
 
 [24]
 We agree with the district court, for the reasons stated by the district court, that the factor of being a "legitimate supplier" is both vague and overbroad. This factor has been deleted from all three ordinances
 
 
 [25]
 In Sawyer, the petitioner had been convicted under a Dade County, Florida loitering ordinance that made criminal "the act of standing" when "a person ... knowingly loiters in any place with one or more persons knowing that a narcotic or dangerous drug ... is being unlawfully used or possessed." The petitioner was convicted for standing next to a drug dealer while the dealer sold narcotics. The petitioner did not have any business association with the drug dealer and knew him only as a friend. The Fifth Circuit held the ordinance to be overbroad, in that it unnecessarily infringed on the First Amendment right of association. More than association with a felon was required to sustain a criminal conviction. See also, Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961)
 
 
 [26]
 We perceive no due process problems with the prohibition against use of, or possession with intent to use, drug paraphernalia
 
 
 [27]
 We also note that Ohio defines many crimes, such as voluntary manslaughter and felonious assault, in terms of a knowing act. Ohio Rev. Code §§ 2903.03, 2903.11. Whether a legislature requires an intentional act or simply a knowing act is its prerogative so long as the statute gives sufficient notice of the conduct made criminal
 
 
 [28]
 This issue is not moot on appeal, since the Parma and North Olmsted ordinances still incorporate the "reason to know" standard in § 620.04(c)
 
 
 [29]
 The district court in World Imports, Inc. reasoned that the "reason to know" standard could be proven as well as actual knowledge. However, this reasoning does not respond to the problems of vagueness or overbreadth
 
 
 [30]
 The district court correctly decided to sever this phrase from the ordinances
 
 
 [31]
 The Supreme Court declared in Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973): "We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." Clearly, advertising about the availability of drug paraphernalia in Parma can be prohibited
 
 
 [32]
 This section of the ordinances is also vague and overbroad, as discussed above, for its use of the terms "reasonably should know" and "designed for."